No. 03-238

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 390

CAROL SNETSINGER, NANCY SIEGEL,
CARLA GRAYSON, ADRIANNE NEFF, and
PRIDE, INC., A Montana Non-Profit Corporation,

>   Plaintiffs and Appellants,

>   v.

MONTANA UNIVERSITY SYSTEM, STATE OF MONTANA,
RICHARD CROFTS, in his official capacity as Commissioner of
Higher Education, and MARGIE THOMPSON, ED JASMIN, LYNN
MORRISON-HAMILTON, CHRISTIAN HUR, JOHN MERCER,
RICHARD ROEHM and MARK SEMMENS, in their official capacities
as members of the Board of Regents,

>   Defendants and Respondents.

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark, Cause No. CDV 2002-097,
                The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

>   For Appellants:
>
>   >   Holly Jo Franz (argued), Franz & Driscoll, Helena, Montana
>   >   Tamara Lange (argued), American Civil Liberties, New York, New York
>   >   Beth Brenneman, ACLU of Montana, Helena, Montana
>
>   For Respondents:
>
>   >   LeRoy H. Schramm (argued), Montana University System, Helena,
>   >   Montana
>
>   For Amicus Northwest Women's Law Center:
>
>   >   James P. Reynolds, Reynolds, Motl and Sherwood, Helena, Montana
>   For Amicus Montana Human Rights Network, Outfield Alliance, Rainbow
>   Connection, University Congregational United Church of Christ, Missoula,
>   United Congregational United Church of Christ, Butte, and Flathead Valley
>   United Church of Christ, Kalispell:

Monte Jewell, Jewell Law Office, Missoula, Montana

For Amicus MEA-MFT:

Jennifer C. Pizer, Lambda Legal Defense & Education Fund, Los Angeles, California

Debra D. Parker; Mark S. Connell, Connell Law Firm, Missoula, Montana

For Amicus Women's Law Caucus:

Joan Jonkel, Kimberly P. Dudik, Attorneys at Law, Missoula, Montana

For Amicus United Families International:

Paul Benjamin Linton, Attorney at Law, Northbrook, Illinois
Lance Lovell, The Lovell Law Firm, Billings, Montana

For Amicus The Montana Catholic Conference:

Michael J. Rieley, Attorney at Law, Helena, Montana

For Amicus Focus on the Family and Family Research Council:

Jason L. Harkins, Attorney at Law, Billings, Montana
Glen Lavy, Alliance Defense Fund, Scottsdale, Arizona

For Amicus Members of the Leadership of the 58th Montana Legislature:

Bridgitt Erickson, Attorney at Law, Lincoln, Montana

For Amicus The National Legal Foundation:

Patrick F. Flaherty, Attorney at Law, Great Falls, Montana
Steven W. Fitschen, Attorney at Law, Virginia Beach, Virginia

Orally Argued and Submitted:  November 13, 2003
Decided:  December 30, 2004

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1      Appellants filed an action in the First Judicial District Court, Lewis and Clark County,

2

seeking a declaratory judgment that the Montana University System's policy prohibiting employees from receiving dependent insurance coverage for their same-sex domestic partners violates their rights under the Montana Constitution. The Montana University System filed a Motion to Dismiss, which the District Court granted.

¶2 The sole issue raised on appeal is whether the Montana University System's policy prohibiting gay employees from receiving insurance coverage for their same-sex domestic partners violates their rights under the Montana Constitution.

¶3 We reverse the District Court.

BACKGROUND

¶4 Carol Snetsinger and Nancy Siegel are same-sex domestic partners, as are Carla Grayson and Adrianne Neff. Snetsinger and Grayson are employees of the Montana University System, but their domestic partners, Siegel and Neff, are not. Snetsinger, Siegel, Grayson, and Neff, along with PRIDE, Inc., a non-profit organization of lesbian, gay, bisexual and transgender Montanans and their supporters, filed an action in the District Court challenging the University System's policy prohibiting same-sex domestic partners of gay[1] employees from purchasing dependent benefits.

¶5 Snetsinger and Siegel consider themselves married and hold themselves out to their families and their community as a couple in a committed, marital relationship. They have stated they would marry if legally permitted to do so. They own their home together in joint tenancy with rights of survivorship, have a joint checking account and share all living

_____

[1]We adopt Appellants' use of the term "gay" to mean lesbians, gay men and bisexual people.

3

expenses. Likewise, Grayson and Neff consider themselves married and hold themselves out as such. They own their home together, share living expenses and are raising a child together.

¶6 As a benefit of employment, the University System provides a group health insurance plan for its employees and their dependents. The University System pays the premium for the employee; if the employee would like coverage for any dependents, the employee must pay an additional premium. The University System's policy defines dependent eligibility. It states:

> An eligible employee . . . may enroll the following dependents in the Plan.
>
> 1. **Spouse**–A lawful spouse as defined in Montana law. See 26-1-602, 40-1-301, and 40-1-311 MCA. A **Declaration of Common-Law Spouse** form may be obtained from the campus payroll/personnel office and must be used if a common-law spouse is to be enrolled in the Plan.
>
> 2. **Child(ren)**–An unmarried dependent child under age 19.
>
> 3. **Student**–An unmarried student under age 25, who is a dependent of the employee and/or spouse and dependent on the employee and/or spouse for support and maintenance, and whose time is principally devoted to the attendance of a school or college. The Claims Administrator may periodically require the submission of proof that student status is maintained.

¶7 Snetsinger and Grayson are not permitted to enroll their same-sex domestic partners because they are not "dependents" as defined by the University System's policy. They argue the policy impermissibly discriminates against them based on their sex, sexual orientation and marital status and violates their rights to equal protection and dignity provided by Article II, Section 4, the right to privacy provided by Article II, Section 10, and the rights to pursue life's basic necessities and to seek safety, health and happiness provided by Article II, Section 3, of the Montana Constitution because the policy does not extend coverage to same-

4

sex domestic partners.

¶8 The University System filed a Motion to Dismiss in the District Court pursuant to Rule 12(b)(6), M.R.Civ.P., on the ground the Complaint did not state a legal claim upon which relief could be granted. The District Court granted the motion. Snetsinger and the other plaintiffs appeal from the District Court's Order.

¶9 We note that an unusual number of Amici Curiae briefs have been filed in this appeal. The following amici have submitted briefs in support of the Appellants: Northwest Women's Law Center; Montana Human Rights Network, Outfield Alliance, Rainbow Connection, University Congregational United Church of Christ, Missoula, United Congregational United Church of Christ, Butte, and Flathead Valley United Church of Christ, Kalispell; MEA-MFT; Women's Law Caucus. Amici who submitted briefs in support of the Respondents are: The Honorable Roy Brown, Duane Grimes, Doug Mood, Fred Thomas, and Corey Stapleton, Members of the Leadership of the 58th Montana Legislature; the Montana Catholic Conference; the National Legal Foundation; Focus On the Family and Family Research Council; United Families International.

STANDARD OF REVIEW

¶10 A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of a claim which would entitle the plaintiff to relief. *Dukes v. Sirius Const., Inc.,* 2003 MT 152, ¶ 11, 316 Mont. 226, ¶ 11, 73 P.3d 781, ¶ 11 (citation omitted). A motion to dismiss under Rule 12(b)(6), M.R.Civ.P., has the effect of admitting all well-pleaded allegations in the complaint. *Dukes,* ¶ 11. In considering the motion, the complaint is construed in the light most favorable to the

plaintiff and all allegations of fact contained therein are taken as true. *Dukes,* ¶ 11 (citation omitted).

¶11 The District Court's determination that the Appellants failed to state a claim for which relief was available is a conclusion of law. Our standard of review of a district court's conclusion of law is whether its interpretation of the law is correct. *Dukes,* ¶ 11.

## DISCUSSION

¶12 Whether the Montana University System's policy prohibiting gay employees from receiving insurance coverage for their same-sex domestic partners violates their rights under the Montana Constitution.

¶13 At the outset, it is important to note what this case is not about. Lest there be any doubt, the Appellants clearly stated, both in their brief and in oral argument, that they are not challenging Montana's marriage laws which provide marriage is available only to partners of the opposite sex. Although the constitutionality of such laws has been attacked in various states recently with much national attention, the Appellants emphasized during oral argument that this case does not present such a challenge. Therefore, we have not been asked nor will we address the question of whether Montana's marriage statutes discriminates against same-sex couples by denying them the right to marry.

¶14 Appellants argue that the University System's Policy violates their rights to equal protection and dignity provided by Article II, Section 4, by classifying them based on their sex, sexual orientation and marital status and depriving them, without sufficient justification, of the benefits other employees and their families receive as compensation. They also argue the policy violates their right to privacy provided by Article II, Section 10, and the rights to

6

pursue life's basic necessities and to seek safety, health and happiness provided by Article II, Section 3, of the Montana Constitution.

¶15    Article II, Section 4, of the Montana Constitution guarantees equal protection of the law to all persons. It provides that "[n]o person shall be denied the equal protection of the laws." "The Fourteenth Amendment to the United States Constitution and Article II, Section 4, of the Montana Constitution embody a fundamental principle of fairness: that the law must treat similarly-situated individuals in a similar manner." *McDermott v. Montana Dept. of Corrections*, 2001 MT 134, ¶ 30, 305 Mont. 462, ¶ 30, 29 P.3d 992, ¶ 30. Article II, Section 4, of the Montana Constitution provides even more individual protection than the Equal Protection Clause in the Fourteenth Amendment of the United States Constitution. *Cottrill v. Cottrill Sodding Serv.* (1987), 229 Mont. 40, 42, 744 P.2d 895, 897.

¶16    When analyzing an equal protection challenge, we "must first identify the classes involved and determine whether they are similarly situated." *Henry v. State Compensation Ins. Fund*, 1999 MT 126, ¶ 27, 294 Mont. 449, ¶ 27, 982 P.2d 456, ¶ 27 (citation omitted). A law or policy that contains an apparently neutral classification may violate equal protection if "in reality [it] constitut[es] a device designed to impose different burdens on different classes of persons." *State v. Spina*, 1999 MT 113, ¶ 85, 294 Mont. 367, ¶ 85, 982 P.2d 421, ¶ 85.

¶17    Once the relevant classifications have been identified, we next determine the appropriate level of scrutiny. *Henry,* ¶ 29. We apply one of three levels of scrutiny when addressing a challenge under the Montana Constitution's Equal Protection Clause: strict scrutiny, middle-tier scrutiny, or the rational basis test. *McDermott*, ¶¶ 31-32. Strict scrutiny

7

applies if a suspect class or fundamental right is affected. *McDermott*, ¶ 31. Under the strict scrutiny standard, the State has the burden of showing that the law, or in this case the policy, is narrowly tailored to serve a compelling government interest. *McDermott*, ¶ 31.

¶18 We apply middle-tier scrutiny if the law or policy affects a right conferred by the Montana Constitution, but is not found in the Constitution's Declaration of Rights. *McDermott*, ¶ 32. Under middle-tier scrutiny, the State must demonstrate the law or policy in question is reasonable and the need for the resulting classification outweighs the value of the right to an individual. *McDermott*, ¶ 32.

¶19 The third level of scrutiny is the rational basis test. *McDermott*, ¶ 32. The rational basis test is appropriate when neither strict scrutiny nor middle-tier scrutiny apply. *McDermott*, ¶ 32. Under the rational basis test, the law or policy must be rationally related to a legitimate government interest. *McDermott*, ¶ 32.

¶20 The District Court began its analysis by noting the University System's policy provides that its employees may obtain health benefits for their dependents, and dependent eligibility is limited to spouses and certain children. The court then defined the classes, for equal protection purposes, as employees who have dependents and those who do not. Thus, according to the District Court, the policy is neutral with respect to gender and sexual orientation. Inherent in this classification definition, however, is the statutory definition of spouse. The District Court reasoned the classification is based on marital status. The District Court determined the marital relationship imposes on married persons certain legal responsibilities, including the duty to support each other out of their property and labor. Section 40-2-102, MCA. The court noted the Appellants are not subject to similar legal

8

obligations and responsibilities as are imposed on married persons. This distinction apparently persuaded the District Court to conclude the University System's policy to provide benefits only to married couples satisfied the rational basis test.

¶21 On appeal, the University System predictably echoes the District Court's conclusion that the policy in question classifies people based on marital status. In arguing the classifications are rational, the University System relies on Montana's statute defining marriage as a relationship between a man and a woman. Section 40-1-103, MCA. The University System also cites to § 40-1-401, MCA, which explicitly states a marriage between persons of the same sex is prohibited. It posits that because state and federal statutes are full of distinctions between married and unmarried individuals (*i.e.* taxes, inheritance, adoption, rights of witnesses and eligibility for government benefits), the University System's reliance on Montana's marriage statute for its classification is "inherently rational." It argues the marriage distinction provides a rational and administratively simple method to determine eligibility for defining dependent status for health benefits.

¶22 In adopting such a policy, the University System rejected the concept of "domestic partners," which would provide same-sex couples the same health benefits as opposite-sex couples. As pointed out by Amicus Northwest Women's Law Center, this is in direct contrast to many universities, corporations and municipalities throughout the United States that do allow same-sex domestic partners to qualify for benefits. Among the list of such entities are the states of Washington, Oregon, and California as well as the United States House of Representatives. The University System's policy at issue here permits three classes of employees to purchase health benefits for their partners: 1) those, who with their partners,

9

are joined in "solemnized marriage" under § 40-1-301, MCA; 2) those, who with their partners, have elected to enter into marriage using a Declaration of Marriage without solemnization under § 40-1-311, MCA; and 3) those, who with their opposite-sex partners, are not married but who sign an "Affidavit of Common Law Marriage." This third avenue is not provided by statute nor does it satisfy § 40-1-311, MCA.

¶23 Although the University System maintains its system is "inherently rational" because it is based on the Montana marriage statutes, we conclude the policy is inherently flawed. The policy allows unmarried opposite-sex couples, who may only have a fleeting relationship, to receive health insurance benefits by signing an Affidavit. The Affidavit is provided by the University System and is typically used to establish benefit eligibility for a partner in a relationship that has not been solemnized or registered as a marriage under Montana law. Presumably, a couple who declines to sign a statutory written declaration of marriage without solemnization, and instead signs the Affidavit provided by the University System, may choose not to marry at all, but rather may choose to sign a document in order to receive employment benefits.

¶24 Common law marriage in Montana is an equitable doctrine used to ensure people are treated fairly once a relationship ends. Under our common law, such a marriage is established when a couple: 1) is competent to enter into a marriage, 2) mutually consents and agrees to a common law marriage, and 3) cohabits and is reputed in the community to be husband and wife. *In re Ober*, 2003 MT 7, ¶ 9, 314 Mont. 20, ¶ 9, 62 P.3d 1114, ¶ 9 (*citing Matter of Estate of Hunsaker,* 1998 MT 279, ¶ 32, 291 Mont. 412, ¶ 32, 968 P.2d 281, ¶ 32). A closer examination of common law marriage in Montana discloses that the

10

concept is designed, in part, to prevent an unjust economic harm to couples who have held themselves out as husband and wife as our common law marriage cases typically deal with the equitable distribution of economic benefits after the death of one of the parties or separation of the relationship. We are aware of no Montana case in which a common law marriage was established prospectively. In fact, one writer has noted that no jurisdiction permits a statement of future intent to create a common law marriage. *See, e.g.,* Hon. John B. Crawley, *Is the Honeymoon over for Common-Law Marriage: A Consideration of the Continued Viability of the Common-Law Marriage Doctrine,* 29 Cumb.L.Rev. 399, 403 (1998-99). We are also not aware of any Montana case in which a common law marriage was established without one of the parties involved in the relationship using extrinsic evidence to prove "that the three elements of common-law marriage all existed at one time." *Hunsaker*, ¶ 43. At the very least, despite assertions by the University System, common law marriages are not automatically recognized by signing their Affidavit. The University System's policy creates no such marriage, nor should it. A policy that allows unmarried opposite-sex couples to sign an Affidavit asserting they are common law married, when they may not be able to legally establish a common law marriage, certainly does not promote marriage, and instead, detracts from it.

¶25    In *Matter of Estate of McClelland* (1975), 168 Mont. 160, 541 P.2d 780, although the couple signed an affidavit asserting a common law marriage, we declined to recognize such a marriage. In *McClelland*, Genie Driver appealed the District Court's determination that she was not the common law wife of James McClelland. We affirmed the District Court's decision, despite the fact that James and Genie signed affidavits declaring their intention to

11

be common law married in order to receive welfare benefits from the states of Oregon and Montana. We reasoned the evidence, including the affidavit, when considered in its entirety, did not support the elements of a common law marriage.

¶26 A closer look at the University System's policy discloses that marital status, as defined by Montana statutes and case law, plays little if any role in determining who is eligible for benefits. Under the policy, the partner of a non-gay employee would qualify for benefits by signing an Affidavit, when the partner of a gay employee would not qualify for the same benefits when signing the same Affidavit.

¶27 Thus, we conclude the District Court erred in its first step of equal protection analysis. In adopting marital status as the litmus test and then reasoning that the classes involved are employees with dependents vs. employees without dependents, the District Court misinterpreted the University System policy. As pointed out above, marital status is not the defining difference. In truth, unmarried opposite-sex couples are able to avail themselves of health benefits under the University System's policy while unmarried same-sex couples are denied the health benefits. These two groups, although similarly situated in all respects other than sexual orientation, are not treated equally and fairly. The principal purpose of the Equal Protection Clause, Article II, Section 4, of the Montana Constitution, is to ensure citizens are not subject to arbitrary and discriminatory state action. Therefore, we conclude there is no justification for treating the two groups differently, nor is the University System's policy rationally related to a legitimate governmental interest. Once the illusory marital status is removed from the analysis, there is no legitimate governmental interest in treating the two groups differently. As former Chief Justice Turnage recognized in his concurrence in *Gryczan v. State* (1997), 283 Mont. 433, 456, 942 P.2d 112, 126, when the State

criminalizes sexual acts between persons of the same-sex and decriminalizes the same sexual conduct engaged in by opposite-sex couples, it is "[c]learly . . . a denial of the constitutional guarantee of equal protection of the law in violation of . . . Article II, Section 4 of the Montana Constitution." Similarly, the University System's policy of denying health benefits to unmarried same-sex couples while granting the benefits to unmarried opposite-sex couples results in a denial of equal protection.

¶28    Further, we are unconvinced that the University System's policy is justified based on administrative efficiency. Other policies could certainly be adopted without infringing on the important constitutional provisions that protect all Montanans. We are confident the University System can meet this task.

¶29    Because we hold that the University System's policy violates equal protection of the laws under the Montana Constitution by impermissibly treating unmarried same-sex couples differently than unmarried opposite-sex couples, we need not address the Appellants' arguments that the policy violates equal protection by classifying them based on sex or that it violates their rights under Article II, Sections 3 and 10, of the Montana Constitution.

¶30    At this point it is important to respond to several of the points urged by the dissent. The dissent contends that we have decided this case on a theory or issue that was not argued or raised by the parties. This simply is not true. The Appellants squarely argued in their brief that the University System's policy was constitutionally infirm because of the Affidavit procedure employed by the University System. Additionally, the issue presented by Appellants in their brief clearly states: "Whether a public employer that provides an opportunity for employees to purchase insurance for spouses or for different-sex domestic partners who sign an Affidavit of Common Law Marriage but not for same-sex domestic

13

partners violates the rights to equal protection and dignity . . . ." Further, the Affidavit procedure was a major focus during oral argument; both sides aired their respective positions eloquently and fully on the issue as framed in this Opinion.

¶31 The dissent argues "[t]he problem is that Appellants did not raise this claim [the Affidavit procedure] in the District Court, the District Court did not consider or rule upon such claim, and therefore, Appellants are not permitted to raise a new argument on appeal." However, nowhere in its brief does the Respondent raise the dissent's argument that the Affidavit procedure was not raised at the District Court level and therefore we should not consider it. Respondent actually devotes approximately five pages of its brief to a common law marriage analysis that includes the Affidavit process, yet never argues the issue was not brought up at the District Court level. Additionally, the constitutionality of the University System's policy of allowing opposite-sex couples to receive benefits while denying same-sex couples those same benefits has always been the issue, both at the District Court and in this Court.

¶32 The dissent also mistakenly contends that somehow we have rewritten the doctrine of common law marriage in Montana. Again, the dissent misinterprets our decision. In truth, it is the dissent who suggests that we deviate from our common law marriage jurisprudence. The dissent apparently takes the position that because the University System's policy is rationally related to the institution of marriage, by applying the "thousands of years of cultural experience," "hundreds of years of legal precedent" and our statutory presumption provided in § 26-1-601(30), MCA, the policy is legitimate. By this rationale, those employees who fill in the Affidavit supplied by the University System are instantly joined or recognized to be in a common law marriage. Notwithstanding this

14

statutory presumption which has existed for decades, our case law has required more than signing a piece of paper to establish a common law marriage. The dissent now urges that we abandon this precedent and declare that only the University System's Affidavit is necessary because the State has an interest in promoting marriage. This rationale is just not correct.

¶33 Meanwhile, we rely on our past precedent that clearly defines what is required to create a common law marriage. We reiterate–we know of no case where a common law marriage has been recognized prospectively. Our case law consistently holds that one of the parties to the  relationship must assert, through extrinsic evidence, that all of the common law marriage elements were met and occurred at the same time, sometime during their relationship. This type of relationship–a marriage–cannot be created through an Affidavit procedure used to provide benefits for University System employees. While the Affidavit could possibly be used as *one part* of the extrinsic evidence used to demonstrate a common law marriage existed, it does not a marriage make. Those employees who sign an Affidavit may not be legally married under Montana law and may not have legal responsibilities to one another, like a married couple would have to each other. Those opposite-sex couples who fill out the Affidavit in order to receive benefits may be shocked to think that they have in fact entered into a marriage that requires court action to dissolve as suggested by the dissent.

¶34 Although the dissent relies on the marriage statutes to provide a rational basis for the University System's policy, we believe the University System's Affidavit process actually serves to dilute marriage as defined and provided for by Montana statute. In this state, there is no common law in any case where the law is declared by statute. Section 1-1-108, MCA. In Montana, common law marriages are declared valid by statute. Section 40-1-403, MCA.

15

However, a common law procedure–a written declaration of a common law marriage such as an affidavit–cannot be followed when it is inconsistent with clear statutory law. Should opposite-sex employees wish to prospectively assure their marital status through the use of an affidavit, there is no need to resort to the "common law" since Montana statutory law provides for a written declaration of marriage without solemnization and they may avail themselves of this informal statutory process as provided by the Legislature in § 40-1-311, MCA.

¶35 Our opinion today reiterates and reaffirms existing common law marriage jurisprudence. We haven't changed anything. We do make clear, however, that any organization that adopts an administrative procedure in order to provide employment benefits to opposite-sex partners who may not be in a legal marital relationship, must do the same for same-sex couples. To not do so violates equal protection.

¶36 As one last point, the dissent worries that state, federal and private agencies that routinely recognize common law marriages by administrative declaration, and pay financial benefits based upon that administrative action could be affected by this decision. However, as the dissent points out, "those agencies defer to the law of the applicant's domiciliary state in regard to the validity and establishment of a common law marriage." Here, we have not changed common law marriage. These agencies may continue to operate in any fashion they desire and rely on our long history of case law in determining whether individuals are "married" by common law. However, should the agencies wish to give prospective recognition of common law marriage, they should require the parties to comply with § 40-1-311, MCA.

¶37 Reversed.

16

/S/ JIM REGNIER

We Concur:

/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART

17

Justice James C. Nelson specially concurs.

## *I. Introduction*

¶38     "We the people"--Montana's Constitution begins with these three words.  These words precede "the people['s]" statement of shared commitment to improving their quality of life and equality of opportunity and to securing the blessings of liberty for present and future generations.  In these three words, there is no mention of race, there is no mention of gender, nor is there any reference to religious affiliation, to ethnic background, to marital status or to sexual orientation.  Simply and eloquently, the first words of Montana's Constitution are words of inclusion.

¶39     Yet, for many Montanans these words carry no such promise.  These Montanans live and work and raise their families knowing that, truly, they are not part of "the people."  These Montanans are gays and lesbians.  And, for that--for being who they are--they are ridiculed, ostracized, despised, demonized and condemned.  Their pleas for respect and for equal justice are answered by their government, by their institutions--and by "*We* the people"--with intolerance and bigotry, albeit impeccably adorned in sanctimonious rhetoric, sterile logic and hollow assurances.

¶40     Though marginalized by their government and institutions, gay and lesbian couples live in 55 of 56 counties in Montana.  More than twelve hundred Montana households identified themselves in the 2000 census as being headed by gay and lesbian couples.  That is roughly 0.6% of the total coupled households in this state, married or unmarried.[2]  Smith

---

[2] *See* U.S. Census Bureau, United States Census 2000, Table PCT22, *Unmarried Partner Households and Sex of Partners*, at http://www.census.gov/main/www/cen2000.html; David Smith and Gary Gates, *Gay and*

19

and Gates estimate that these official data represent an undercount of about 62%.[3]

¶41    I concur in our Opinion.  However, Montana's Constitution provides a stronger bulwark against the majoritarian oppression that gays and lesbians suffer daily in this State and for the claims under consideration here.  It is for this reason that I write separately.

¶42    I begin with some background and then turn to my interpretation of Montana's Constitution as regards the issue before us.  Finally, I will conclude with what I believe is a proper basis for resolving this case in addition to that set out in this Court's Opinion.

## II.  Background

¶43    The *amicus* brief filed by the Montana Human Rights Network, et al., in this case thoroughly discusses how gays and lesbians historically have been unfairly stigmatized and stereotyped.  They have been wrongfully accused of having impaired judgment, stability, reliability and general social and vocational capabilities. The evidence is to the contrary. American Psychiatric Association, *Fact Sheet:  Gay, Lesbian and Bisexual Issues* (Feb. 2000) (hereinafter *APA Fact Sheet*); American Psychological Association, *Minutes of the Annual Meeting of the Council of Representatives,*  30 Am. Psychologist 620, 633 (1975). They have been falsely stereotyped as being pedophiles.  Carole Jenny, et al., *Are Children at Risk of Sexual Abuse by Homosexuals?*, 94 Pediatrics 44 (1994) (finding that only 0.7% of child sex abusers are homosexual); John Boswell, *Christianity, Social Tolerance and Homosexuality* 16 (1980) (noting that accusations of child molestation have historically been

*Lesbian Families in the United States: Same-Sex Unmarried Partner Households* (2001), at http://www.hrc.org/content/contentgroups/ (hereinafter *Smith*).

[3] *See Smith*, at n.2.

20

made against disfavored minorities vulnerable to such "propaganda," be they homosexuals, Jews or others).

¶44     Children raised by gay and lesbian parents have been found to develop no differently than children raised by heterosexual parents in terms of self-esteem, psychological well-being, cognitive functioning and social adjustment, despite claims to the contrary.   *APA Fact Sheet* ("[N]umerous studies have shown that the children of gay parents are as likely to be healthy and well adjusted as children raised in heterosexual households."); Judith Stacey and Timothy Biblarz, *(How) Does the Sexual Orientation of Parent Matter?*, 66 Am. Soc. Rev. 159, 161 (2001) (surveying research); Ellen C. Perrin, M.D., and the Committee on Psychological Aspects of Child and Family Health, American Academy of Pediatrics, *Policy Statement: Coparent or Second Parent Adoption by Same Sex Parents*, 109 Pediatrics 339, 339 (Feb. 2002).   And, there is no evidence that gays and lesbians do not function as effectively in the workplace or that they contribute any less to society than do their heterosexual counterparts.

¶45     It is overwhelmingly clear that gays and lesbians have been historically subject to unequal treatment and invidious discrimination.  *See, e.g.*, *Watkins v. United States Army* (9th Cir. 1989), 875 F.2d 699, 724-28 (Norris, J., concurring),  *cert. denied*, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990); *High Tech Gays v. Defense Indus. Sec. Clearance Office* (9th Cir. 1990), 895 F.2d 563, 573; *Ben-Shalom v. Marsh* (7th Cir. 1989), 881 F.2d 454, 465, *cert denied by Ben-Shalom v. Stone*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Padula v. Webster* (D.C. Cir. 1987), 822 F.2d 97, 104; *Tanner v. Oregon Health Sciences Univ.* (1998), 971 P.2d 435, 447; Laurence H. Tribe, *American Constitutional Law*

1616 (2d ed. 1988).

¶46 Gays and lesbians have been stereotyped as Communists and security risks. Patricia A. Cain, *Litigating for Lesbian and Gay Rights: A Legal History*, 79 Va. L. Rev. 1551, 1565 (Oct. 1993) (hereinafter *Cain*). In 1953, President Eisenhower issued Executive Order 10,450 which required the dismissal of all homosexual government employees. *Cain*, at 1566. Until 1965, homosexual aliens could not be admitted to the United States because they were classified as sexual deviants under 8 U.S.C. § 1182(a)(4). Tracey Rich, *Sexual Orientation Discrimination in the Wake of Bowers v. Hardwick*, 22 Ga. L. Rev. 773, 773 n.4. (Spring 1988); *Boutilier v. INS* (1967), 387 U.S. 118, 124, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (upholding deportation because "Congress commanded that homosexuals not be allowed to enter.")

¶47 Similarly, in the workplace, gays and lesbians historically have been the focus of discriminatory treatment. *See, e.g., Weaver v. Nebo School Dist.* (D. Utah 1998), 29 F.Supp.2d 1279 (lesbian high school coach in Utah fired because of sexual orientation); *Miguel v. Guess* (Wash.App.Div.3 2002), 51 P.3d 89 (lesbian x-ray technician in hospital fired because of sexual orientation); *De Santis v. Pacific Tel. & Tel. Co.* (9th Cir. 1979), 608 F.2d 327 (California telephone company discriminated against gay and lesbian operators); *Quinn v. Nassau County Police Dept.* (E.D.N.Y. 1999), 53 F.Supp.2d 347 (gay New York police officer sexually harassed because of his sexual orientation).

¶48 And, gays and lesbians are frequently the victims of violence and hate crimes. Federal Bureau of Investigation, *Hate Crime Statistics 2000* (November 19, 2001), and *2001*

22

(November 25, 2002).[4]  Indeed, grim testament to this sort of violence and hate occurred in our sister state of Wyoming in October 1998, when Matthew Shephard, a gay college student, was savagely beaten, tied to a fence and left to die.

¶49    Gay and lesbian parents are frequently denied custody of their children or are subjected to burdensome restrictions because of their sexual orientation and irrespective of their parenting ability.  *See, e.g., Ex parte H.H.* (Ala. 2002), 830 So.2d 21, 26 (Moore, C.J., concurring in denial of custody to lesbian mother on ground that "[h]omosexual conduct is . . . abhorrent, immoral, detestable, a crime against nature, and a violation of the laws of nature and of nature's God [and] an inherent evil against which children must be protected."); *Weigand v. Houghton* (Miss. 1999), 730 So.2d 581, 586-87; *Bottoms v. Bottoms* (Va. 1995), 457 S.E.2d 102, 107-08.

---

[4] *See also* Bureau of Justice Statistics, *Hate Crimes Reported in NIBRS 1997-99* (Sept. 2001), at http://www.ojp.gov/bjs/pub/pdf/hcrn99.pdf (homosexuals face disproportionate levels of bias-motivated violence and harassment).

¶50     The American Psychiatric Association points out that

> when compared to other social groups, homosexuals are still among the most stigmatized groups in the nation. Hate crimes are prevalent. Gay men and lesbians are still banned from serving openly in the US military service. Child custody decisions still frequently view gay and lesbian people as unfit parents. Gay and lesbian adolescents are often taunted and humiliated in their school settings. Many professional persons and employees in all occupations are still fearful of identifying as gay or lesbians in their work settings. Gay relationships are not recognized in any legal way.

*APA Fact Sheet*. In fact, gays and lesbians share a history of persecution comparable to that of blacks and women. *People v. Garcia* (Cal.App.4th Dist. 2000), 77 Cal.App.4th 1269, 1276, 92 Cal.Rptr.2d 339.

¶51     Similarly, majoritarian politics relegates gays and lesbians to a position of political powerlessness. As Justices Brennan and Marshall observed, "[b]ecause of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena." *Rowland v. Mad River Local School Dist.* (1985), 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1377, 84 L.Ed.2d 392 (Brennan, J., dissenting from denial of *certiorari*; joined by Marshall, J.).

¶52     Montana reflects this discriminatory animus. Despite the judicial de-criminalization of same-sex relationships in *Gryczan v. State* (1997), 283 Mont. 433, 942 P.2d 112, and despite pleas every session by the gay community, the Legislature has refused to amend §§ 45-2-101(20) and 45-5-505, MCA, to except out of the deviate sexual conduct statutes non-commercial, same-sex conduct between consenting adults. The 1997 Legislature amended § 40-1-401, MCA, to specifically prohibit same sex marriages and contractual civil relationships. In 2001, a bill seeking to add sexual orientation to Montana's hate crime

statute (HB 233) never made it out of the House Judiciary Committee. Constitutional Initiative 96, amending the Montana Constitution to prohibit same sex marriages, passed overwhelmingly at the November 2004 general election. Sadly, many politicians and "*We the people*" rarely pass up an opportunity to bash and condemn gays and lesbians despite the fact that these citizens are our neighbors and that they work, pay taxes, vote, hold public office, own businesses, provide professional services, worship, raise their families and serve their communities in the same manner as heterosexuals.

¶53 In terms of the workplace, there is no evidence either in the record here or anecdotally that gays and lesbians are any less qualified, reliable or productive employees than are heterosexuals. Indeed, as *amicus* MEA-MFT points out, because equal work merits equal pay and benefits, nearly 200 educational institutions in at least 35 states and thousands of companies, including 40% of Fortune 500 companies, include domestic partners in their benefits policies.[5] Likewise, there is no evidence either in the record here or anecdotally that extending health and medical insurance benefits to gay and lesbian domestic partners increases the benefit or administrative costs of insurance plans. Indeed, the evidence is to the contrary.[6]

---

[5] *See* Human Rights Campaign WorkNet, *Domestic Partnership Benefits, Colleges and Universities*, at http://www.hrc.org/worknet/asp_search/results.asp?sKey=List&List=III&t=DP and http://www.hrc.org/worknet/dp/index.asp.

[6] *See, for example,* KPMG Peat Marwick, *Health Benefits in 1997*, *Executive Summary 6* (June 1997); International Society of Certified Employee Benefit Specialists, *Domestic Partner Benefits: Commentary*, Census (May 1995), at 1 (hereinafter *ISCEBS*); Society for Human Resources Management, *Domestic Partner Benefits Mini-Survey* (1997) (hereinafter *SHRM Mini-Survey*); Hewitt Associates, *Domestic Partner Benefits 2000* 1, 27 (2000).

### III. Montana's Constitution

¶54    When the Declaration of Rights of Montana's Constitution was drafted, the Bill of Rights Committee (the Committee) clearly intended that the rights set out in Article II stand on their own footing and provide individuals with fundamental rights and protections far broader than those available through the federal system. The Committee's February 22, 1972 transmittal letter to the Convention delegates states that "new safeguards" had been added to the Declaration [Bill] of Rights "to meet the changing circumstances of contemporary life" and:

> In presenting this proposed Declaration of Rights, the committee notes that the guidelines and protections for the exercise of liberty in a free society come not from government but from the people who create that government.
> It is that spirit which has motivated this committee to insure for Montana's future, through this bill of rights, a more responsible government that is Constitutionally commanded never to forget that government is created solely for the welfare of the people so that the people can more fully enjoy the heritage of American liberty within the structure of that government.

Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 619 (hereinafter *Proposal*).

¶55    Taking these admonitions to heart, this Court has, for example, applied the broader protections of Montana's Constitution in a number of contexts involving individual privacy (*Gryczan v. State* (1997), 283 Mont. 433, 942 P.2d 112); personal autonomy (*Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364);  search and seizure (*State v. Bullock* (1995), 272 Mont. 361, 901 P.2d 61;  *State v. Siegal* (1997), 281 Mont. 250, 934 P.2d 176, *overruled in part by State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556; *State v. Elison*, 2000 MT 288, 302 Mont. 228, 14 P.3d 456); the right to counsel (*State v. Johnson* (1986), 221 Mont. 503, 719 P.2d 1248); the environment (*MEIC v. Dept. of Environmental*

*Quality*, 1999 MT 248, 296 Mont. 207, 988 P.2d 1236); and the right of participation and the right to know (*Common Cause v. Statutory Committee* (1994), 263 Mont. 324, 868 P.2d 604; *Great Falls Tribune v. Public Schools* (1992), 255 Mont. 125, 841 P.2d 502; *Associated Press v. Bd. of Public Educ.* (1991), 246 Mont. 386, 804 P.2d 376; *Jarussi v. Board of Trustees* (1983), 204 Mont. 131, 664 P.2d 316).

¶56 Furthermore, and acknowledging the Committee's statement that no part of the Constitution is more important, *Proposal*, p. 619, we have repeatedly recognized the rights found in Montana's Declaration of Rights as being "fundamental," meaning that these rights are significant components of liberty, any infringement of which will trigger the highest level of scrutiny, and thus, the highest level of protection by the courts. *Walker v. State*, 2003 MT 134, ¶ 74, 316 Mont. 103, ¶ 74, 68 P.3d 872, ¶ 74 (citing *Dorwart v. Caraway*, 2002 MT 240, ¶ 96, 312 Mont. 1, ¶ 96, 58 P.3d 128, ¶ 96 (Nelson, J., concurring); *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311; *Kloss v. Edward D. Jones & Co.*, 2002 MT 129, ¶ 52, 310 Mont. 123, ¶ 52, 54 P.3d 1, ¶ 52 (Nelson, J., concurring), *cert. denied*, 538 U.S. 956, 123 S.Ct. 1633, 155 L.Ed.2d 506 (2003)).

¶57 It follows, therefore, that Montana's Constitution should, likewise, provide more protection against discrimination based on sexual orientation than the Court's Opinion in this case reflects.

¶58 The case at bar is one involving the fundamental guarantee of individual dignity and equal protection protected under Article II, Section 4 of the Montana Constitution. For more than a decade and a half we have recognized that Montana's equal protection clause "provides for even more individual protection" than does the federal equal protection clause in section

27

one of the Fourteenth Amendment. *Cottrill v. Cottrill Sodding Service* (1987), 229 Mont 40, 42, 744 P.2d 895, 897.

¶59     Montana's equal protection clause, Article II, Section 4, provides:

> **Individual dignity.** The dignity of the human being is inviolable.  No person shall be denied the equal protection of the laws.  Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

As Professors Larry Elison and Fritz Snyder observe:

> As a practical matter, the vagaries of life coupled with the allure of power and privilege deny equality among persons, and make difficult the application and enforcement of equal protection before the law.  Perhaps that is why "in recent years the equal protection guarantee has become the single most important concept in the Constitution for the protection of individual rights."

Larry M. Elison and Fritz Snyder, *The Montana Constitution:  A Reference Guide* 34 (2001) (hereinafter *Elison*) (quoting John E. Nowwak & Ronald D. Rotunda, *Constitutional Law* 595 (5th ed. 1995)).

¶60     Historically, the mantle of equal protection law has expanded steadily to protect different groups of persons who were prosecuted and abused for simply being who they were born to be--racial and religious minorities and women, are examples.

> Prior to passage of the Fourteenth Amendment to the U.S. Constitution (and perhaps the French Revolution), the idea of equality was limited to persons of power, usually free, white male property owners. . . .  Over time, the notion of equality under law has expanded [to include Blacks and women], and theoretically most persons are now included.  The 1972 Montana Constitution provides the most inclusive scheme of "equal rights" of any known constitution.

*Elison*, at 35.  And, "[a]t the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply

28

components of a racial [or] sexual . . . class." *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 152-53, 114 S.Ct. 1419, 1434, 128 L.Ed.2d. 89.

¶61    However much equal protection jurisprudence has enlarged the scope of persons guaranteed this right, unfortunately gays and lesbians have been left behind.  Sexual and gender orientation is not considered a "suspect class" and discrimination so based does not merit strict scrutiny/compelling interest analysis under federal law.  *See Lofton v. Kearney* (S.D. Fla. 2001), 157 F.Supp.2d 1372, 1382 (collecting cases at n.14), *affirmed by Lofton v. Sec'y of the Dep't of Children and Family Services* (11th Cir. 2004), 358 F.3d 804; *Baker v. State* (Vt. 1999), 744 A.2d 864, 878 n.10; *Lawrence v. Texas* (2003), 539 U.S. 558, 579-88, 123 S.Ct. 2472, 2484-85, 156 L.Ed.2d 508 (O'Connor, J., concurring).  In fact, as this separate Opinion earlier points out, gays and lesbians continue to suffer the effects of unequal treatment, often with the blessing, express or implied, of the government, its institutions, and its elected officials.  Indeed, as already noted, laws and policies have been adopted which specifically target gays and lesbians for unequal treatment.

¶62    As with federal case law, this Court's jurisprudence has never acknowledged gender orientation as a suspect class.  Although we have stated that Article II, Section 4 provides more individual protection than does its federal counterpart, *Cottrill*, 299 Mont. at 42, 744 P.2d at 897, in practice, Montana's equal protection jurisprudence--as the Court's Opinion demonstrates--largely follows federal law.  *See* Vicki C. Jackson, *Constitutional Dialogue*

29

*and Human Dignity:  States and Transnational Constitutional Discourse*, 65 Mont. L. Rev. 15, 28-29 n.45 (Winter 2004) (hereinafter *Jackson*); *Elison*, at 36-38.[7]

¶63     This approach, however, is antithetical to the plain language of Montana's equal protection clause and, in particular, to one of its components--the guarantee of inviolable human dignity--a textual protection unique among the fifty states.  *Jackson*, at 21.

¶64     Montana's human dignity clause was drawn from the Puerto Rican Constitution, Article II, Section 1.  *Jackson*, at 22.  This clause follows a history of international and foreign constitution-making and human rights declarations at the end of World War II and reflects the international community's focus on human dignity as a fundamental value. *Jackson*, at 26.  Puerto Rican courts and constitutional scholars have characterized the concept of the dignity of the human being as

> "the moral basis for democratic government," and implies the "essential equality" of all people before the law.  In other words, the inviolable dignity of human beings must be reflected in both the governance structures of a democracy and the way in which individual members are treated.

*Jackson*, at 23 (quoting Juan M. Garcia-Passalacqua, *Puerto Rican Constitutional Law* 41 (1974)).

¶65     Notwithstanding these venerable roots, however, this Court's jurisprudence has, for the most part, treated the human dignity clause, not as a fundamental value to be recognized

---

[7] *But see Dorwart*, ¶ 84 (federal constitutional decisions may neither bound nor weaken similar, but greater guarantees of individual rights afforded by Montana's Constitution).

in its own right,[8] but rather, as reinforcing other values such as the protection against unlawful searches and seizures, government discrimination, and privacy. *Jackson*, at 27-32.

¶66    The dimensions of the individual dignity clause included within Article II, Section 4, have not been well developed by this Court. *See Elison*, at 34, 36; Matthew O. Clifford and Thomas P. Huff, *Some Thoughts on the Meaning and Scope of the Montana Constitution's "Dignity" Clause With Possible Applications*, 61 Mont. L. Rev. 301 (hereinafter *Clifford*). Nor have we discussed the various clauses within Article II, Section 4 in relation to each other and with a view to interpreting this section as a coherent whole.

¶67    For example, in *Walker,* we held that, read together with Article II, Section 22, the individual dignity clause provides Montanans with greater protections from cruel and unusual punishments than does the federal constitution. We also noted that the federal constitution does not expressly provide for the right to human dignity. *Walker,* ¶ 73. And, in *In re Mental Health of K.G.F.*, 2001 MT 140, ¶¶ 45-60, 306 Mont. 1, ¶¶ 45-60, 29 P.3d 485, ¶¶ 45-60, we stated that the dignity of those persons subject to involuntary mental health commitments required effective assistance of counsel and appropriate due process and that groups of people should not be singled out and "devalued as members of society" or treated as "an inferior second-class of citizens." We have also invoked the dignity clause in other contexts: *Armstrong*, ¶¶ 71-73 (bodily integrity); *Oberg v. Billings* (1983), 207 Mont. 277, 280, 674 P.2d 494, 495 (right not to be subjected to a polygraph exam as a condition of employment); *Girard v. Williams*, 1998 MT 231, ¶¶ 77-80, 291 Mont. 49, ¶¶ 77-80, 966 P.2d 1155, ¶¶ 77-

---

[8] *But see Walker*, ¶ 82, where we recognized the right of inviolable human dignity as a separate, stand-alone right.

80 (Nelson, J., concurring) (child custody); and *In re C.R.O.*, 2002 MT 50, ¶¶ 45-54, 309 Mont. 48, ¶¶ 45-54, 43 P.3d 913, ¶¶ 45-54 (Nelson, J., Cotter, J., Leaphart, J., dissenting) (termination of parental rights).

¶68    Our approach, however, has failed to give full effect to the language and unique constituent parts of Montana's equal protection clause and to the textual protection of inviolable human dignity in cases involving fundamental human rights.

> Article II, section 4 reaches beyond the boundaries of traditional equal protection. The language is unique to the extent it recognizes human dignity as a dimension of, or corollary to, the concept of equal protection of the law. The language also portends to create a right to equality within the realm of private activity, eliminating the "state action" requirement attached to the comparable provision of the U.S. Constitution.

*Elison*, at 35.

¶69    In my view, this Court's equal protection jurisprudence has been too long bounded by federal equal protection case law where fundamental human rights are at issue. There is no good reason why we should not begin to afford all Montanans the full protections intended by the framers when they adopted Article II, Section 4. As one commentator has suggested, "Montana lawyers should jettison federal discrimination analysis in favor of a Montana analysis free of gender-based standards." *Elison*, at 36 (quoting Wendy A. Fitzgerald, *Toward Dignity in the Workplace: Miller-Wohl and Beyond*, 49 Mont. L. Rev. 147 (1988)).

¶70    I agree and I believe that this is the appropriate case in which we should begin to develop the law of equal protection based on Montana's unique Constitutional guarantee of the inviolability of human dignity coupled with the right to equal protection of the law and the prohibition against private and State discrimination. It is to that approach that I now turn.

*IV. The Analytical Model*

¶71    Again, Article II, Section 4 provides:

> **Individual dignity.** The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.

Clifford and Huff point out that this provision of the Constitution is composed of three clauses: the individual dignity clause (after which the entire section is named); the equal protection clause; and the anti-discrimination clause. *Clifford*, at 304.

¶72    However, our canons of constitutional construction require that we treat each separate clause as both substantively meaningful and not redundant. "In construing a constitutional provision it is our duty to give meaning to every word, phrase, clause, and sentence therein, if it is possible so to do." *State ex rel. Diederichs v. State Highway Comm'n* (1931), 89 Mont. 205, 211, 296 P. 1033, 1035. Clifford and Huff suggest that the plain language of Article II, Section 4 be interpreted as a cohesive whole so as to fulfill this canon of construction:

> [T]he language of the dignity provision moves in a logical progression from the general to the specific. The title of the provision itself is "Individual Dignity;" thus, we must presume that all the language in the provision treats this topic in some respect. The first sentence, the dignity clause, obviously addresses dignity by declaring that human dignity is inviolable. The second sentence, we believe, goes on to declare one way in which human dignity can be violated-- by denying someone the equal protection of the law based on some sort of arbitrary classification. . . .
>     The third sentence of Article 4 [sic], the anti-discrimination clause, we believe, fleshes out the meaning of the equal protection right by enumerating certain types of classifications which the authors of the dignity provision believed to be arbitrary. . . .

*Clifford*, at 305-06.

¶73   Using this analytical model, I address the issue before us:  Whether the Montana University System's policy prohibiting homosexual employees from receiving insurance coverage for their same-sex domestic partners violates their rights under the Montana Constitution.

*A.*

¶74    Article II, Section 4 is entitled "Individual dignity." The first clause of Article II, Section 4, the "individual dignity clause," provides: "The dignity of the human being is inviolable." As to this clause, Clifford and Huff state:

> The title of the provision itself is "Individual Dignity;" thus, we must presume that all the language in the provision treats this topic in some respect. The first sentence, the dignity clause, obviously addresses dignity by declaring that human dignity is inviolable.

*Clifford*, at 305.

¶75    Under this part of the model, we must necessarily start by acknowledging the obvious: pursuant to Article II, Section 4, the right of human dignity is "inviolable." That means that this right is "incapable of being violated." *Black's Law Dictionary* 832 (7th ed. 1999). As Clifford and Huff observe: "To say, as the Montana Constitution does, that '[t]he dignity of the human being is inviolable' is thus to assert that the intrinsic worth, the basic humanity, of persons may not be violated." *Clifford*, at 303.

¶76    This statement strikes at the heart of the issue before us. The intrinsic worth and the basic humanity of gays and lesbians--i.e., their human dignity--has not been recognized to date.[9] Indeed, as already demonstrated, this fundamental, core value is, in many instances, denied gays and lesbians through laws and policies enacted by the government, as here.

---

[9] *Gryczan* was decided on privacy grounds under Article II, Section 10. *Gryczan*, 283 Mont. at 456, 942 P.2d at 126. However, then Chief Justice Jean A. Turnage would have reached the same result in *Gryczan* on the basis of equal protection. *Gryczan*, 283 Mont. at 456-58, 942 P.2d at 126-28 (Turnage, C.J., concurring and dissenting).

35

¶77  That human dignity is described as being "inviolable" is significant, as this right is the only Article II guarantee that carries this absolute prohibition:  Human dignity may not be violated--no exceptions.

¶78  Article II, Section 4 is consistent with this Country's historical treatment of human dignity as a central, foundational ideal at the root of our concept and system of ordered liberty and of our ethical tradition.  *See Clifford*, at 308-14.  There is nothing in the record or debates of Montana's Constitutional Convention which would demonstrate that the delegates had any other view of the scope of human dignity.  Indeed, Delegate Wade Dahood, chair of the Committee, stated:  "[t]he intent of Section 4 is simply to provide that every individual in the State of Montana, as a citizen of this state, may pursue his inalienable rights without having any shadows cast upon his dignity through unwarranted discrimination."  Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643.

¶79  Laws and policies which single out, degrade and demonize persons based on their gender or sexual orientation--i.e., for simply being who they are--casts a shadow on the individual dignity of such persons and devalues those persons basic humanity and the intrinsic worth that all people possess.  *See Walker*, ¶¶ 81-82.  Such treatment repudiates the "essential equality" of all people before the law and the "moral basis for democratic government."  *Jackson*, at 23.  Gays and lesbians have the moral right and moral responsibility to confront the most fundamental questions about the meaning and value of their own lives, to answer to their own consciences and convictions, *see Armstrong*, ¶ 72, and, as autonomous human beings, the inherent right to form relationships with whomever they choose.  These rights are no more nor less than heterosexuals enjoy.  Indeed, they are precisely the same rights that

36

those representing and supporting the Respondents rightly enjoy and demand. Unequal treatment based on sexual orientation is an affront to the inviolable right of human dignity. Government policies that allow or require such treatment are, in my view, *per se* unlawful under the dignity clause of Article II, Section 4. Such is the University's policy at issue here--it treats gay and lesbian couples unequally in terms of employment; equal work does not merit equal benefits based on nothing else than gender and sexual orientation.

*B.*

¶80    The second clause of Article II, Section 4, the "equal protection clause," provides: "No person shall be denied the equal protection of the laws." As to that clause, Clifford's and Huff's model provides:

> The second sentence, we believe, goes on to declare one way in which human dignity can be violated--by denying someone the equal protection of the law based on some sort of arbitrary classification.

*Clifford*, at 305-06.

¶81    Again it must be noted at the outset, that the equal protection clause states that "No person" shall be denied the equal protection of the laws. The language is clear and unambiguous. "No person" means simply that--there is no language in this clause excepting out of this guarantee gays and lesbians. At least our society has not come to the position that homosexuals are not even to be considered as persons.

¶82    As has already been pointed out, neither federal jurisprudence nor this Court's case law recognizes gender or sexual orientation as an arbitrary classification or "suspect class" for equal protection purposes. This view, however popular, is inherently illogical when one acknowledges that the entire focus of laws directed at gays and lesbians is sex. Majoritarian

37

morality and prevailing political ideology are offended by the fact that people of the same sex have sexual relations with each other. This offense translates into laws and policies that explicitly or implicitly demonize homosexuals and make them a disfavored class. Heterosexuals, on the other hand, are a favored class because their sexual relations are with persons of the opposite sex. Homosexuals are a disfavored class because their sexual relations are with persons of the same sex. Regardless, however, the defining criteria of either class is plainly and simply sex--or, to be more specific, with which sex one is having sex. To paraphrase an old adage, "When they say it isn't about sex, it's about sex."

¶83    Laws based on gender orientation are palpably sex-based and are, therefore, suspect classifications under conventional equal protection analysis.

¶84    Andrew Koppelman, an associate professor of law and political science at Northwestern University, makes this point in two starkly simple syllogisms:

> *First syllogism:*
> (1) Laws that make people's legal rights depend on their sex are sex-based classifications.
> (2) Laws that discriminate against gay people are laws that make people's legal rights depend on their sex. . . .
> Therefore,
> (3) Laws that discriminate against gay people are sex-based classifications.
>
> *Second syllogism:*
> (1) Sex-based classifications are subject to heightened scrutiny.
> (2) (from the first syllogism) Laws that discriminate against gay people are sex-based classifications.
> Therefore,
> (3) Laws that discriminate against gay people are subject to heightened scrutiny.

Andrew Koppelman, *The Gay Rights Question in Contemporary American Law* 53-54 (2002) (hereinafter *Koppelman*).

38

¶85 Moreover, it has been the law in Montana for two decades that

> [a] suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."

*In re C.H.* (1984), 210 Mont. 184, 198, 683 P.2d 931, 938 (quoting *San Antonio School District v. Rodriguez* (1973), 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16). Given the discussion with which I began this separate Opinion, it cannot reasonably be argued that gays and lesbians do not fit within this definition of suspect class.

¶86 Therefore, I conclude that gays and lesbians constitute a suspect class under conventional equal protection analysis. Unequal treatment based on sexual orientation denies the person equal treatment, equal justice, and equal protection under the law.

¶87 In the case at bar, heterosexual couples are entitled to more and better employment benefits than are homosexual couples. This unequal treatment is based on gender and sexual orientation and is, therefore, sex-based--it is a classification which is inherently arbitrary and suspect, because it violates the inviolable human dignity of the persons so classified and those persons' fundamental right to equal protection of the laws.

*C.*

¶88 The third clause of Article II, Section 4, the "anti-discrimination clause," provides: "Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas." The final part of Clifford's and Huff's model states:

> The third sentence of Article 4 [sic], the anti-discrimination clause, we believe, fleshes out the meaning of the equal protection right by enumerating certain types of classifications which the authors of the dignity provision believed to be arbitrary. . . .

*Clifford*, at 306.

¶89     The arbitrary classifications enumerated in the discrimination clause of Section 4 are race, color, sex, culture, social origin or condition, and political or religious ideas.  But, as Clifford and Huff point out, this list is not exhaustive of arbitrary classifications, because if that were the case, then the second clause, the equal protection clause, would be surplusage. Presumably the framers of the Constitution included the more general equal protection clause so as to leave open the possibility of other prohibited classifications beyond those recognized at that time.  Moreover, the inclusion of the more general provision protecting the right of human dignity must presume that dignity can be violated in ways that do not involve arbitrary classifications.  *Clifford*, at 306.  Were that not the case, then the individual dignity clause would be surplusage as well; it would have no independent significance in the scheme of Article II, Section 4.

¶90     Notwithstanding my conclusion that discrimination based on sexual orientation is sex-based under conventional equal protection analysis, *infra*, I agree with Clifford and Huff that the list of arbitrary classifications in the third clause of Article II, Section 4 is not--and, indeed, should not--be exhaustive.  I would hold that homosexuals comprise a suspect class in their own right.  I reach that conclusion by reference to another important, but virtually ignored, section in the Declaration of Rights.

¶91     The Delegates' intention that our Constitution's Declaration of Rights not be interpreted as limiting civil rights, but, rather, as the enumeration of basic guarantees that  a

free and sovereign society--"We the people"--should enjoy is best exemplified in the Committee's proposal of Article II, Section 34 to the Convention delegates and in the subsequent adoption of this provision. Article II, Section 34 states:

> **Unenumerated rights**. The enumeration in this constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people.

¶92     In proposing the adoption of this section, the Committee did two things. First, it recognized that the rights enumerated in Montana's Constitution were not exclusive--i.e., that there are unenumerated rights or "rights beyond those specifically listed" which are retained by the people. *Proposal*, p. 645. Second, and important to my discussion here, the Committee considered this section to be "a crucial part of any effort to revitalize the state government's approach to civil liberties questions. [And that this section] may be the source of innovative judicial activity in the civil liberties field." *Proposal*, p. 645.

¶93     The proceedings of the Constitutional Convention reveal no debate on Article II, Section 34. Rather, it was adopted unanimously on the straightforward, yet eloquent recommendation of Delegate Dorothy Eck, who stated: "I think that [this section] is completely self-explanatory. There are rights which are not enumerated which the people of Montana should not be denied." Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1832.

¶94     Elison and Snyder observe that the Committee's belief that Article II, Section 34 could be the source of "innovative judicial activity" in the area of civil liberties has not been realized; that there are no cases referencing or interpreting this section. *Elison*, at 86. While technically inaccurate that no cases have referenced this section, *see Dorwart*, n.3 (Nelson,

J., concurring), it is true that this Court has not applied Article II, Section 34 in any substantive context.

¶95  Elison and Snyder suggest:

> The section could be used as the basis for the introduction of a theory of natural law or an expansion of the use of substantive due process or judicial finding of unstated individual rights hidden in the self-reliant, free-thinking, idiosyncratic Montanan mythology. Presumptively, this could limit state police power and enlarge existing rights or create new rights. . . . While plenary state legislative power and unenumerated rights might appear to be in conflict or contradictory, they are not. In a state constitution a provision on unenumerated rights as a balance against state police power is a potentially useful idea, but something of an anomaly. Historically, within the context of state governments in a federal system, the limitations on plenary legislative power are the specific prohibitions and restrictions found in a constitutional declaration of rights. Adding unenumerated rights to specific prohibitions and restrictions could transfer to the people indirectly, and to the courts directly, additional means of checking plenary legislative power.

*Elison*, at 87.

¶96  Given that Article II, Section 34 was specifically adopted as a Constitutional source by which "to revitalize the state government's approach to civil liberties questions," *Proposal*, at 645, it is entirely appropriate that the enumerated protections afforded by Article II, Section 4 be interpreted in that broader context in the case at bar. In point of fact, it is entirely appropriate that we hold, under Article II, Section 34, that one of the unenumerated prohibited classifications beyond those recognized at the time the Constitution was adopted is the classification of individuals based on gender or sexual orientation.

¶97  In summary, applying the Clifford and Huff model, I would hold that: (a) laws and policies that make people's rights dependent on gender or sexual orientation violate the inviolable human dignity clause of Article II, Section 4; (b) classifications of persons on the basis of gender or sexual orientation are sex-based and are therefore arbitrary and suspect

42

under conventional equal protection analysis; and, in what I believe to be a better approach, (c) reading Article II, Sections 4 and 34 together, it is appropriate to establish, as a matter of Montana constitutional law, that classifications based on gender or sexual orientation are suspect classifications in their own right and are in addition to those enumerated in the third clause of this State's equal protection provision.

¶98 Pursuant to this analysis, I would hold that applying strict scrutiny, the Respondents have failed to demonstrate a compelling state interest for treating heterosexual and homosexual couples differently in terms of the benefits relating to employment. *See Gryczan*, 283 Mont. at 449, 942 P.2d at 122. I reach this conclusion for the following reasons.

¶99 The Respondents' arguments are framed in terms of who can be married and who cannot--heterosexuals can and homosexuals cannot. *Amici* supporting the Respondents focus their arguments on family values, majoritarian concepts of morality, religious doctrine and preserving the sanctity of marriage both as a civil and as a sectarian institution. These arguments are red herrings. They miss the mark and ignore the core issue here--whether gays and lesbians have the right to individual human dignity, equal protection of the laws and freedom from discrimination under Article II, Section 4 of the Montana Constitution with respect to obtaining the same economic benefits of employment that heterosexuals receive for the same work.

¶100 Certainly, secular organizations and religions have the right to define for their own members their beliefs, doctrines, moral tenets, rules and rituals. Individuals have the right to hold whatever personal opinions they choose. That is not to say, however, that these institutions, groups and persons may impose their philosophies and values on minorities and

on others who ascribe to a different view and whose conduct and life styles cause no harm.

We stated in *Gryczan:*

> James Madison decried the potential for a tyranny of the majority, pointing out that it was as important in our system of government to guard the minority in our society against injustice by the majority, as it was to guard society from the oppression of its rulers. *The Federalist, No. 51*, at 351 (James Madison) (Jacob E. Cooke ed., 1961). . . .
> . . . [Despite governmental laws and policies and perceived societal notions of what is acceptable in a moral sense] there are certain rights so fundamental that they will not be denied to a minority no matter how despised by society.

*Gryczan*, 283 Mont. at 455, 942 P.2d at 125-26.  As individual privacy was such a right in

*Gryczan*, the fundamental rights to human dignity, to equal protection of the laws and to

freedom from invidious discrimination, are in the case at bar.

¶101  The University in particular and employers in general are perfectly capable of

providing gays and lesbians and gay and lesbian couples with the same economic benefits of

employment that heterosexuals enjoy.  And that is all this case is about--providing similarly

situated employees the same economic benefits from employment.  This case is not about gay

marriage or gay unions, as the Court's Opinion clearly acknowledges.

¶102  As already noted, because providing gay and lesbian couples with the same

employment benefits that heterosexual couples receive can be accomplished without

additional cost or administrative burden to the employer, there is no legitimate economic

rationale for the Respondents' position, much less that of *Amici*.  As this case shows,

employers are able to determine partner benefits on criteria generally applicable to all people.

¶103  Here, the criteria arbitrarily chosen is marriage. But, as the Court's Opinion

demonstrates, marriage can be proven by the simple expedient of two people signing an

44

affidavit. However, if the underlying rationale of providing partner benefits is to insure that the partners are residing together and have accepted mutual commitments of financial support, that can be satisfied by affidavit, declaration, contract or some other writing in addition to proof of marriage. Even assuming one can create a common law marriage by signing an affidavit (which as our Opinion shows is a false premise, *see In re Estate of McClelland* (1975), 168 Mont. 160, 164-65, 541 P.2d 780, 783), the employer has no real basis for insuring that such persons are, in fact, married, or that their arrangement is simply not one of convenience to acquire important health insurance benefits. Indeed, there is nothing stopping such persons from simply walking away from the whole arrangement when it suits their circumstances to do so.

¶104 Furthermore, the only basis for the argument that granting gay and lesbian couples equal employment benefits will destroy the institution of marriage is that the employer has made an arbitrary decision to use marriage as the defining criteria for granting these benefits. Were the defining criteria different--as it could easily be--the whole issue of marriage, religion and morality would cease to exist. Paying homosexual workers the same as their heterosexual counterparts has not destroyed any important institutions in or the moral fabric of our society, and there is no evidentiary basis for concluding that extending health insurance benefits to gay and lesbian couples will have that effect either. Indeed, that has not occurred in those states and with those many employers and institutions that have extended such benefits already.

¶105   Additionally, there are three reasons why the preserving-the-institution-of-marriage argument fails.  First, this is not a gay marriage case.  This case is about providing equal financial benefits to similarly situated employees of the same employer.

¶106   Second, the premise that extending economic employment benefits to gay and lesbian couples will somehow harm marriage is itself without merit.  There is no actual evidence in the record here to support that conclusion.  Indeed, arguably, heterosexuals have done more to denigrate the institution of marriage than gay and lesbian couples ever have or likely ever will.  In the years since 1998, the divorce rate in Montana has averaged nearly 40%.[10] Moreover, this rate does not take into account any number of heterosexuals "living in sin," without the benefit of any marriage, nor does it take into account married heterosexuals who are engaged in extra-marital affairs.  Our society lionizes professional athletes, entertainers, and high-profile politicians despite (although one would sometimes think, because of) marital infidelity and divorces.  One need simply turn on the television to understand that the "*Ozzie and Harriet*" and "*Leave it to Beaver*" genre of television shows are historical artifacts which have no popularity with the American viewing public.  I submit that those championing the preservation-of-marriage argument accord a good deal more to the sanctity of the institution than do a substantial percentage of Montanans and other Americans as evidenced by their actual conduct.

¶107   Third, and importantly for our discussion here, the preservation-of-marriage argument is, transparently, little more than a convenient vehicle through which to condemn and to discriminate against gays and lesbians because of their lifestyles and gender orientations.  *See*

---

[10] National Center for Health Statistics at http://www.cdc.gov/nchs.

*Clifford*, at 334-35.  To be sure, homosexuality offends many people's sense of morality and

the teachings of many religions.  However, we live in a pluralistic society, and, as we said in

*Gryczan*:

> With respect to regulation of morals, the police power should properly be exercised to protect each individual's right to be free from interference in defining and pursuing his own morality but not to enforce a majority morality on persons whose conduct does not harm others. . . .  Indeed, what is considered to be "moral" changes with the times and is dependent upon societal background.  Spiritual leadership, not the government, has the responsibility for striving to improve the morality of individuals.  *Campbell* [*v. Sundquist* (Tenn.Ct.App. 1996)], 926 S.W.2d [250,] 265-66 (quoting *Commonwealth v. Bonadio* (1980), 490 Pa. 91, 415 A.2d 47, 50).
>      . . . Our Constitution does not protect morality; it does, however, guarantee to all persons, whether in the majority or in a minority, those certain basic freedoms and rights which are set forth in the Declaration of Rights. . . .

*Gryczan*, 283 Mont. at 454, 942 P.2d at 125.  Again, as the right of individual privacy was

one of those basic freedoms and rights in *Gryczan*, the right of human dignity, equal

protection of the laws and freedom from discrimination are, likewise, basic freedoms and

rights which must be protected in the case at bar.  A policy of classifying persons for its own

sake cannot be justified.  *Romer v. Evans* (1996), 517 U.S. 620, 635, 116 S.Ct. 1620, 1629,

134 L.Ed.2d 855.  There is no compelling state interest for the Respondent's policy at issue

here.

*Conclusion*

¶108   While I concur in the Court's Opinion, I also believe that this case calls for a new approach to analyzing cases arising under Article II, Section 4 of the Montana Constitution. I submit that the approach discussed above honors the plain language, the framers' intent and the historical underpinnings of Montana's unique provisions protecting the rights of individual human dignity and of equal protection of the laws and prohibiting discrimination.

¶109   Using this approach, I would hold that (a) laws and policies that make people's rights dependent on gender or sexual orientation violate the inviolable human dignity clause of Article II, Section 4; (b) classifications of persons on the basis of gender or sexual orientation are sex-based and are therefore arbitrary and suspect under conventional equal protection analysis; and, in what I believe to be a better view, (c) reading Article II, Sections 4 and 34 together, it is appropriate to establish, as a matter of Montana Constitutional law, that classifications based on gender or sexual orientation are suspect classifications in their own right in addition to those enumerated in the third clause of this State's equal protection provision. I would also hold that laws and policies which are based on gender or sexual orientation are subject to strict scrutiny/compelling state interest analysis and that under that analysis, the Respondents' policy at issue here fails.

¶110   Indeed, in this approach we give real meaning to the plain language and to the spirit of Article II, Section 4 and we realize the Constitutional Convention's charge under Article II, Section 34 that our decisions become a crucial part of the effort to revitalize the state

government's approach to civil liberties questions--civil liberties that "We the people" are, *without exception*, entitled to enjoy.

¶111   With this additional rationale, I concur in our Opinion.


/S/ JAMES C. NELSON

Justice Jim Rice dissenting.

¶112 I respectfully dissent. The Court fails to reference or properly apply the statutes and case law, thereby radically altering common law marriage in Montana, and failing to honor the reliance that many couples place in the law. I will begin with the Court's opinion, then turn to the claims pled by the Appellants in the District Court, and conclude with a response to the concurrence.

¶113 Before turning to the legal analysis, two preliminary points must be made. First, the Court's opinion does not address the issues which were pled by the Appellants. No part of the rationale upon which the Court resolves this case–that the Affidavit process fails to establish a common-law marriage–was a part of the challenge filed by the Appellants in the District Court. Indeed, the Appellants pled precisely the opposite, arguing that the policy is discriminatory for the very reason that the University *grants* benefits based upon marriage, including common-law marriage. As stated in their Complaint:

> The State of Montana explicitly prohibits same-sex marriage. *By conditioning receipt of critical employment benefits on solemnized or common-law marriage* while denying lesbians and gay men the right to marry, Defendants deprive Plaintiffs of their fundamental rights under the Montana Constitution.

Complaint, ¶ 3 (emphasis added). Appellants' claims are constitutional challenges. However, the Court has ignored those pled claims and generated an alternative rationale on its own. This creates an unfairness in the proceeding for the Respondents, who had no opportunity to defend against the defects in its Affidavit process which are asserted by the Court.

¶114 The Court responds to this issue by stating: "The dissent contends that we have decided this case on a theory or issue that was not argued or raised by the parties. This is

50

simply not true. The Appellants squarely argued in their brief . . . ." *See* ¶ 30. Unfortunately, the Court misunderstands the nature of this issue. I agree with the Court that Appellants raised the issue of the validity of the common-law Affidavit *in their brief filed before this Court*. However, that is not the problem. The problem is that Appellants did not raise this claim in the District Court, the District Court did not consider or rule upon such claim, and therefore, Appellants are not permitted to raise a new argument on appeal. Allowing Appellants to do so grants them favorable treatment not granted to any other litigant before this Court.

¶115 This is confirmed by a review of the Appellants' Complaint and the District Court record. The Complaint states:

> 53. Opposite-sex domestic partners who have not obtained a solemnized marriage may obtain access to such benefits *by signing an affidavit of common-law marriage.*
>
> . . . .
>
> 57. A solemnized marriage between persons of the same sex is prohibited. Mont. Code. Ann. § 40-1-401.
>
> 58. Likewise, common-law marriage between persons of the same sex is prohibited. Mont. Code Ann. § 40-1-401.
>
> 59. *Montana law prohibits the Plaintiff couples from entering into either solemnized or common-law marriage.*
>
> 60. For an employee's domestic partner to qualify as a "dependent" under Defendants' interpretation and administration of applicable state statutes and regulations, or, in the alternative, under those statutes and regulations themselves, *the employee and his or her partner must enter into a solemnized marriage or sign an affidavit of common-law marriage.*

61. Gay and lesbian employees are not permitted to obtain coverage for their same-sex domestic partners *because Defendants intentionally condition the receipt of such benefits on marriage* while denying lesbians and gay men the right to marry.

(Emphasis added.)   As can be seen, the Complaint's allegations clearly challenged the University's policy of conditioning benefits based upon marriage, either solemnization or common law.   Nowhere does the Complaint allege that the Affidavit itself was insufficient to establish a common-law marriage–that is a new argument on appeal.   In fact, the Complaint's prayer requested eight specific forms of relief: *all eight* ask that the court declare that the marriage statutes and the University's regulations based thereon are unconstitutional because "Defendants, or in the alternative, the governing Montana statutes and regulations, deny to *unmarried employees certain employment benefits that are provided to married employees* . . . ." Complaint, ¶ 86 (emphasis added).

¶116   Respondents, Defendants below, filed a motion to dismiss the Complaint.   Because Appellants had only raised constitutional claims in their Complaint, these were the only issues discussed by Respondents in their motion to dismiss and supporting brief:

> The gist of the Complaint is that the University System group benefits *eligibility criterion for spouses of employees, based as it is on the marriage relationship as recognized in Montana law, prevents the two University employed Plaintiffs from securing coverage for their same-sex partners*. . . . Plaintiffs claim that the inability of University System employees to cover their same-sex domestic partners under the group benefits plan violates four different sections of the Montana Constitution.

(Emphasis added.)

52

¶117 Respondents' motion to dismiss then discussed Appellants' eight constitutional claims and asked the District Court to dismiss them. In response to the motion to dismiss, Appellants explained the nature of the claims they were making, reaffirming the allegations pled in their Complaint. Appellants' brief in opposition to Respondents' motion to dismiss stated as follows:

> Like all lesbian and gay employees of the Montana University System, Plaintiffs are not permitted to purchase benefits for their same-sex partners because Defendants limit dependent benefits to legal spouses. In contrast, opposite-sex couples may obtain dependent benefits merely by signing an Affidavit of Common-Law Marriage or entering into a solemnized marriage. *By conditioning receipt of critical employment benefits on solemnized or common-law marriage, Defendants discriminatorily deprive Plaintiffs* of adequate and affordable insurance protection for their family members, violating their fundamental rights under the Montana Constitution.
>
> . . . .
>
> *. . . Defendants' argument rests on the faulty presumption that using marriage to define eligibility* for benefits makes their policy gender neutral and insulates it from equal protection review. In reality, however, Defendants' policy classifies employees and their partners based on sex *because* [emphasis in original] they use "spouse," a specifically sex-based term, to determine eligibility for benefits.
>
> . . . .
>
> . . . The university could have chosen to distribute benefits using any number of guidelines . . . . Among these many options, the university chose marriage as the defining line. By definition, using marriage means defining eligibility for benefits in sex-based terms . . . . *This lawsuit only asks the Court to determine whether Defendants have a compelling reason for using the sex-based definition of marriage to determine eligibility for benefits.*

(Emphasis added.)

¶118 Consequently, in rendering its decision, the District Court analyzed the issues precisely as framed by the Appellants:

> Plaintiffs . . . contend that by conditioning receipt of health insurance on marriage, while denying lesbians and gay men the right to marry, Defendants are depriving them of their fundamental rights under the Montana constitution. They ask for a declaratory judgment that the Defendants' interpretation and administration of the applicable state statutes and regulations violate their right to dignity, to privacy, to equal protection, to seek safety, health and happiness, and to pursue life's basic necessities. Alternatively Plaintiffs ask the Court to declare that the statutes and the regulations violate their rights.

The District Court did not address the sufficiency of the common-law Affidavit in its order, because it was not an issue raised by the Appellants before the District Court.

¶119 Thus, as pled, argued, submitted and decided in the District Court, this case was strictly a constitutional challenge to the University's *use of marriage* for benefit eligibility. Indeed, this the way the Appellants defined their own claims before the District Court: "This lawsuit only asks the Court to determine whether Defendants have a compelling reason for using the sex-based definition of marriage . . . ." At no time did they challenge the Affidavit process as failing to properly apply the law of common-law marriage.

¶120 Our Court does not address new arguments or changes of argument on appeal. "The rule is well established that this Court will not address an issue raised for the first time on appeal." *State v. McCaslin*, 2004 MT 212, ¶ 49, 322 Mont. 350, ¶ 49, 96 P.3d 722, ¶ 49. *See also State v. Bar-Jonah*, 2004 MT 344, ¶ 124, 324 Mont. 278, ¶ 124, ___ P.3d ___,¶ 124; *State v. Heath*, 2004 MT 58, ¶ 39, 320 Mont. 211, ¶ 39, 89 P.3d 947, ¶ 39; *State v. Peterson*, 2002 MT 65, ¶ 24; 309 Mont. 199, ¶ 24, 44 P.3d 499, ¶ 24; *State v. Weaselboy*, 1999 MT

274, ¶ 16, 296 Mont. 503, ¶ 16, 989 P.2d 836, ¶ 16; *State v. Lucero*, 2004 MT 248, ¶ 20, 323 Mont. 42, ¶ 20, 97 P.3d 1106, ¶ 20; *Ellenburg v. Chase*, 2004 MT 66, ¶ 18, 320 Mont. 315, ¶ 18, 87 P.3d 473, ¶ 18; *State v. Martinez*, 2003 MT 65, ¶ 17, 314 Mont. 434, ¶ 17, 67 P.3d 207, ¶ 17; *State v. Minez*, 2003 MT 344, ¶ 19, 318 Mont. 478, ¶ 19, 82 P.3d 1, ¶ 19; *Schlemmer v. N. Cent. Life Ins. Co.*, 2001 MT 256, ¶ 22, 307 Mont. 203, ¶ 22, 37 P.3d 63, ¶ 22; *Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15. As this partial list of recent cases illustrates, our rule is firm. As we reasoned in *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, ¶ 12, 78 P.3d 850, ¶ 12, "[t]he rule is well established that this Court will not address an issue raised for the first time on appeal. . . . A party may not raise new arguments or change its legal theory on appeal, because it is fundamentally unfair to fault the trial court for failing to rule on an issue it was never given the opportunity to consider." *Adgerson*, ¶ 12 (citations omitted). The purpose for our rule is well illustrated here, where the District Court was not presented with Appellants' arguments.

¶121 The Court replies that Respondent University did not raise an objection to Appellants' new argument in its brief. The Court apparently believes that, somehow, this cures the problem for which the rule exists–unfairness to the district court and disrespect for the process. The Court errs again. We have routinely and consistently applied the rule, regardless of whether the opposing party raised the issue. *State v. Heath* is a recent example. There we declined to address an issue the Appellant had failed to raise in the district court. *Heath*, ¶

39. However, Respondent State had not raised the Appellant's failure to raise the issue in the district court as an objection in its briefing.

¶122    Thus, by accepting the arguments which Appellants have raised for the first time on appeal, and incorporating them into its opinion, the Court has violated our longstanding rule and has afforded special treatment to Appellants which is not afforded to other litigants who come before this Court.

¶123    The second preliminary matter is that numerous factual assertions and assumptions offered by the Court are without evidentiary support. The District Court resolved this matter by granting the Respondents' motion to dismiss the Appellants' Complaint. There was no factfinding, and there is no factual record other than pleaded facts. Nonetheless, in ¶ 23, the Court states that "[p]resumably, a couple who declines to sign a statutory written declaration of marriage without solemnization, and instead signs the Affidavit provided by the University System, may choose not to marry at all . . . ." However, there is no evidence that the couples who signed an Affidavit "may choose not to marry at all." To the contrary, this statement directly conflicts with the claims in Appellants' Complaint, quoted above, and with the University's Affidavit of Common-Law Marriage, which states:

### AFFIDAVIT OF COMMON-LAW MARRIAGE

We, the undersigned, both being over the age of 18 years, have mutually consented and contracted to become husband and wife; we are now, and have been since_____ (date), living together as husband and wife, and have mutually consented to hold towards each other the relationship of husband and wife, and to assume towards each other all the responsibilities and duties which the law attached to such a relationship.

56

The Affidavit plainly states that the couple has "mutually consented" to be husband and wife and have assumed "all the responsibilities and duties which the law attached to such relationship." This is the factual record in this matter. It is not in our power to reject it, for there is no evidence–even more, no *allegation*–of anything different. The Court expresses dismay that "[t]hose opposite-sex couples who fill out the Affidavit in order to receive benefits may be shocked to think that they have in fact entered into a marriage that requires court action to dissolve . . . ." *See* ¶ 33. Whether or not they are shocked is not in the record, but more to the point, that is not the issue. For purposes of this case, they have signed an Affidavit which said that very thing: they were assuming the marital relationship with "all the responsibilities and duties which the law attached to such a relationship." That is our record. It is unchallenged by pleading, briefing or evidence. Thus, as a factual matter, it is simply erroneous for the Court to find that any of the couples who signed the Affidavit "may choose not to marry." Although intent is one element of common-law marriage (that is, the parties' mutual consent, discussed herein), the pleadings and the Affidavit clearly establish the couples' mutual consent to their common-law marital relationship.[11]

¶124 On that factually-flawed premise, the Court then finds that such a policy "allows unmarried opposite-sex couples to sign an Affidavit." *See* ¶ 24. This conclusion is also factually flawed because the University's policy allows no such thing. To the contrary, the

---

[11]I would offer an apology to any couple who may be offended by the Court's description of them as perhaps "choos[ing] not to marry at all" or as having only "a fleeting relationship." *See* ¶ 23. Although there is no evidence in the record to support these statements, I am sure it was not the Court's intention to offend.

policy allows only *married* opposite-sex couples to obtain marital health benefits, including those opposite-sex couples who are *married under the common law.* The University's policy requires these couples to sign the Affidavit attesting to their marital relationship. Likewise, the pleadings illustrate the Court's clear error in stating that marital status "plays little if any role in determining who is eligible for benefits." *See* ¶ 26. Again, to the contrary, marital status is the *exclusive factor* in determining partner benefits under the University's policy.

¶125 Therefore, the Court has decided this matter on a basis which, I respectfully submit, is both procedurally and factually flawed. That notwithstanding, I turn to an analysis of the substance of the rationale regarding common-law marriage proffered by the Court, before turning to the issues pled by the Appellants.

¶126 The Court's holding, which invalidates the common-law marriage claims of the couples who signed the Affidavit, is premised upon several policy observations and legal propositions which are either unsupported with authority, or which cite to authority which is inapposite. First, in ¶ 24, the Court offers an entirely new definition of common-law marriage, without citation to authority, as "an equitable doctrine used to ensure people are treated fairly once a relationship ends." Second, the Court offers an entirely new rationale for common-law marriage, again without citation to authority except for a unspecified reference to our "typical cases," as a concept "designed, in part, to prevent an unjust economic harm to couples who have held themselves out as husband and wife . . . ." Thirdly, the Court opines, with no reference to authority whatsoever, that "[a]t the very least . . . common law marriages are not automatically recognized by signing [an] Affidavit." The

Court then concludes that a common-law marriage cannot be established "prospectively." I respectfully submit that, in my opinion, none of these propositions comport with Montana law.

¶127 I concur with the Court's citation to *Ober* and *Hunsaker* for the three elements of a common-law marriage which must be proven under our law–a couple's competency, consent and confirmation. Regarding these elements, the party asserting that a common-law marriage exists has the burden of proving all three elements. *Hunsaker*, ¶ 32 (citing *Matter of Estate of Vandenhook* (1993), 259 Mont. 201, 204, 855 P.2d 518, 520). However, "public policy, as well as statutory law, favors the finding of a valid marriage." *Ober*, ¶ 16. Further, the burden of proof is made lighter by § 26-1-602(30), MCA, which establishes a presumption that "[a] man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage." Although a disputable presumption, we have held in the common-law marriage context that "the presumption in favor of matrimony is one of the strongest known to the law and that every intendment of the law is in favor of matrimony . . . ." *Estate of Murnion* (1984), 212 Mont. 107, 113, 686 P.2d 893, 897. Indeed, this statutory presumption is "itself sufficient to establish the marriage unless overcome by other evidence." *Spradlin v. United States* (D. Mont. 1967), 262 F.Supp. 502, 505. "The effect of [the marital] presumption, of course, is to place the burden on the other party to overcome the presumption." *Murnion*, 212 Mont. at 113, 686 P.2d at 897.

¶128 Thus, the language of the Affidavit and the law's presumption in favor of marriage clearly establish a prima facie claim of common-law marriage because the presumption is

"itself sufficient to establish the marriage." *Spradlin*, 262 F.Supp. at 505. Consequently, the University acted properly under the law in recognizing the marriages based upon the Affidavit. Further, the pleadings did not challenge the marriage claims of couples signing the Affidavit, and therefore, there can be no argument that Appellants carried a burden to "overcome the presumption" that lies in favor of the couples' claims. *Murnion*, 212 Mont. at 113, 686 P.2d at 897. Therefore, as a matter of *proof* (here, within the context of pleaded facts), the couples' claims of common-law marriage have undeniably been established under Montana law.

¶129   For this reason, the Court's reliance on *Estate of McClelland*, simply because the evidence in that case included an affidavit, is incorrect. In *McClelland*, the parties' affidavit was but one piece of the "extensive evidence presented by both sides as to the existence or nonexistence of the common law marriage" at issue. *McClelland*, 168 Mont. at 162, 541 P.2d at 781-82. This Court decided that case, not on the sufficiency of the affidavit, but because:

> the facts establishing the common law marriage of appellant and deceased are conflicting. This Court has consistently held that where there is a conflict in the evidence, the findings of the trial court are presumed to be correct if supported by evidence most favorable to the prevailing party.

*McClelland*, 168 Mont. at 165, 541 P.2d at 783. In its citation to *McClelland*, the Court mentions neither the other "extensive evidence" introduced in that case nor the basis for the *McClelland* court's decision. In regard to the sufficiency of proof, *McClelland* is completely

irrelevant because, in this case, there are *no* pleaded facts which rebut the Affidavit and legal presumption in favor of marriage.[12]

¶130   The Court then states, without citation to any case, that "[o]ur case law consistently holds that one of the parties to the relationship must assert, through extrinsic evidence, that all of the common law marriage elements were met . . . ." *See* ¶ 33.  The Court reiterates that it is "not aware" of any Montana case in which a common-law marriage was established without "extrinsic evidence."  This statement is erroneous, both as a matter of law and of fact, as demonstrated by the record in this case.

¶131   First, the law.  Contrary to the Court's new requirement of "extrinsic evidence," we have held that "[t]he mutual consent of the parties [for a common-law marriage] does not need to be expressed in any particular form." *Hunsaker*, ¶ 34 (citing *In re Estate of Slavens* (1973), 162 Mont. 123, 126, 509 P.2d 293, 295).  Thus, the Court errs in asserting that our law "clearly defines" what kind of evidence is necessary to establish a common-law marriage. *See* ¶ 33.  To the contrary, we have allowed parties to demonstrate a common-law marriage by whatever form they are able.

¶132   Further, the Court ignores the presumption which the law imposes in favor of a marriage and the impact it has on evidentiary questions.  In *Spradlin*, the Appeals Council of

_____

[12]For a case which illustrates the minimum proof necessary to establish a common-law marriage, *see Matter of Estate of Alcorn* (1994), 263 Mont. 353, 868 P.2d 629, where we upheld a marriage claim based upon a horseshoe-shaped ring, a horseshoe design within a walkway, and one party's sworn assertion that they were married. *Alcorn*, 263 Mont. at 357, 868 P.2d at 631.  Here, superior to the proof in *Alcorn*, *both* parties have sworn to the marital relationship.

the Social Security Administration had concluded there was "no evidence" presented in support of the elements of a common-law marriage, and ruled against the party claiming the marriage. *Spradlin*, 262 F.Supp. at 504-05. The United States District Court reversed, concluding that the decision of the Appeals Council was contrary to Montana law, and explaining the nature of Montana's statutory presumption on questions of proof:

> The [statutory] presumption itself was proof of a marriage, ceremonial or common-law. . . . If there was no ceremonial marriage, the presumption would be sufficient to establish both the capacity of the parties and the consent of the parties for the purposes of the common-law marriage. The statute creating the presumption, by the use of the words "lawful contract" embraces both the fact of the consent and the capacity to consent. . . . [T]he presumption of marriage should be weighed on the one side and on the other side [contrary evidence] should be weighed . . . . [H]owever, there is no requirement in the law that the capacity to marry should be conclusively established. The statutory presumption was itself sufficient to establish the marriage unless overcome by other evidence.

*Spradlin*, 262 F.Supp. at 505. Thus, the statutory presumption *alone* is sufficient evidence to establish a common-law marriage–there is no other "extrinsic evidence" requirement in the law.

¶133 The Court's error is further demonstrated by the practical realities of proving a common-law marriage. State, federal and private agencies routinely recognize common-law marriages by administrative declaration, and pay financial benefits based upon that administrative action. By law and by contract, these agencies defer to the law of the applicant's domiciliary state in regard to the validity and establishment of a common-law marriage. This is particularly true of federal law governing eligibility for various federal benefits. "In deciding who is entitled to federal survivor benefits, [the United States Office

62

of Personnel Management] looks to state common law to define marriage and to determine who is the legal widow . . . ." *Huff v. Director, United States Office of Pers. Mgmt.* (3rd Cir. 1994), 40 F.3d 35, 39 (citing 5 C.F.R. § 831.603). In *LaRochelle v. Office of Pers. Mgmt.* (Fed. Cir. 1985), 774 F.2d 1079, LaRochelle claimed to be a common-law spouse who was entitled to benefits. The court stated:

> Texas, the state of the LaRochelles' domicile, recognizes common-law marriages. Tex.Fam.Code Ann. § 1.91(a)(2) (Vernon 1975). Because [the Office of Personnel Management] will consult state law where federal law is not determinative, this type of marriage satisfies the survivor annuity provisions.

*LaRochelle*, 774 F.2d at 1080. The common-law marriage determination is an agency decision that does not require court involvement, unless a party seeks judicial review of the agency decision, *see Slate v. OPM* (1982), 10 M.S.P.R. 658, and *Goldbach v. OPM* (1989), 42 M.S.P.R. 57, but which carefully applies the particular requirements of the law in the applicant's jurisdiction. *See Gainey v. Barnhart* (8th Cir. 2002), 299 F.3d 1004, 1006-07, and *McKenzie v. Harris* (3rd Cir. 1982), 679 F.2d 8, 10-13 (analyzing elements and proof necessary under Michigan and Pennsylvania law, respectively, for determination of common-law marriage for purposes of Social Security benefits). An applicant from a state which does not recognize common-law marriages cannot qualify for benefits by claiming to be married under the common law. *See Howard v. Keohane* (E.D. Ky. 1995), 898 F.Supp. 459, 462-63 (marriage claim could not be maintained under Louisiana law, which did not recognize common-law marriages). Thus, if state law denies common-law marriages without a court

63

order, that requirement will be enforced by the agencies applying the state law to determine eligibility.

¶134 Administrative determination of common-law marriage based upon the law of the applicant's domicile occurs in a variety of other public and private benefit contexts as well, including Social Security, 20 C.F.R. § 404.344; ERISA plans, *Iron Workers Mid-South Pension Fund v. Stoll* (E.D. La. 1991), 771 F.Supp. 781, 783-84; Longshoremen's and Harbor Workers' Compensation Act benefits, *Marcus v. Office of Workers' Compensation* (D.C. Cir. 1976), 548 F.2d 1044, 1047 (citing 33 U.S.C. § 902(16)); trade union trust plans, *Int'l Painters & Allied Trades Indus. Pension Fund v. Calabro* (E.D. Pa. 2004), 312 F.Supp.2d 697, 701-02; Department of Defense benefits, DOD Military Pay and Allowances Entitlements Manual, Rules for Determining Relationship and Dependency, ¶ 30233, Validity of Member's Marriage; and property and casualty coverage, *National Sec. Fire & Cas. Co. v. Minchew* (Ala. 1979), 372 So.2d 327. This is only a partial list. It has been said that marriage is "'a unique gateway' to hundreds of rights under state law and over 1,000 under federal law . . . ." *Same-Sex Marriage*, Duke Law Magazine, Fall 2004, p. 6. Under 5 C.F.R. § 831.603, which governs federal personnel plans, "[m]arriage means a marriage recognized in law or equity under the whole law of the jurisdiction . . . of the employee."

¶135 Thus, administrative declarations of common-law marriage occur daily. Regarding necessary proof, the Social Security Administration, for example, will grant marital benefits under Montana law upon less convincing evidence than the University's Affidavit:

(b) *Preferred evidence.* Preferred evidence of a common-law marriage is–

(1) If both the husband and wife are alive, their signed statements and those of two blood relatives;

. . .

(c) *Other evidence of common-law marriage*. If you cannot get preferred evidence of a common-law marriage, we will ask you to explain why and to give us other convincing evidence of the marriage. We may not ask you for statements from a blood relative or other person if we believe other evidence presented to us proves the common-law marriage.

20 C.F.R. § 404.726(b)(1) and (c).

¶136 Thus, it can be seen that the Court's new "extrinsic evidence" requirement, for which it can cite no authority, is not only inconsistent with our law, but, as a practical matter, will interfere with efforts of various agencies, applying Montana law, to make common-law marriage determinations.

¶137 Secondly, the Court is wrong on the "facts" of the matter. Even if it was appropriate to impose a new "extrinsic evidence" requirement, such evidence has been provided in this case. The Court belittles the University's Affidavit process as simply "signing a piece of paper."[13] *See* ¶ 32. As a matter of evidence, however, it is uncontested that the couples who have signed the Affidavit have lived together since a past date, have consented and contracted to be husband and wife, are currently living together, and have assumed all responsibilities and duties under the law related to the marital relationship. This "extrinsic evidence" about their relationship has not been contested, and therefore, they have established a common-law

---

[13]Demonstrating a marriage by way of a "piece of paper" is hardly a novel concept. Rejecting a marriage on the basis of a "piece of paper" is.

marriage as a matter of fact under the record in this case. The Court is simply closing its eyes to the pled, uncontested facts here.

¶138 The Court next faults the University's Affidavit process because "no jurisdiction permits a statement of future intent to create a common law marriage" and because "[w]e are aware of no Montana case in which a common law marriage was established prospectively." *See* ¶ 24. There are no such Montana cases because that is not the law. "The party asserting the existence of a common-law marriage must . . . prove that the three elements of common-law marriage *all existed at one time*." *Hunsaker*, ¶ 43 (emphasis added). The law of common-law marriage does not recognize an element that is to occur in the future; all the elements must occur together. The elements of a common-law marriage "must take place at a set time." *Hunsaker*, ¶ 43. However, this issue is a red herring, because there is no attempt here to prove the marriage prospectively. Rather, the Affidavit is evidence of both *past* intention and action (stating that the couple has *previously* mutually consented to be husband and wife, and have been living together and holding toward each other as husband and wife since a past date) and a *present* action and intention (stating the couple is *now* mutually consenting to be husband and wife, and is now living together and holding toward each other as husband and wife). No future intent is involved here.

¶139 The Court then attempts, without citation to authority, to explain that the application of the common-law marriage doctrine is limited to only those situations arising "after the death of one of the parties or separation of the relationship." *See* ¶ 24. This is simply inaccurate. This Court, like other courts around the country, has addressed common-law

66

marriage in many contexts, including those in which both parties are *alive* and the relationship is *continuing*. *See State v. Baldwin*, 2003 MT 346, ¶ 37, 318 Mont. 489, ¶ 37, 81 P.3d 488, ¶ 37 (defendant seeking application of spousal privilege); *Howard* (couple seeking marital communication rights within prison); *Scott v. Bd. of Trustees of Mobile S.S.* (Ala.1988), 540 So.2d 657, 658 (couple seeking spousal welfare benefits); *National Sec. Fire & Cas. Co.* (couple seeking to establish insurable property interest by marriage). The Court cites no authority for its new rule limiting common-law marriage claims to post-death and post-relationship situations.

¶140  The Court then reasons that common-law marriage is an equitable doctrine "used to ensure people are treated fairly once a relationship ends." ¶ 24.  I would agree that Montana law protects people once a relationship ends, but not by a parsing of the common law doctrine.  Rather, that is done by statute, which provides as follows:

> **40-1-403. Validity of common-law marriage**. Common-law marriages are not invalidated by this chapter.

> **40-1-404.  Putative spouse**.  Any person who has cohabited with another to whom he is not legally married in the good faith belief that he was married to that person is a putative spouse until knowledge of the fact that he is not legally married terminates his status and prevents acquisition of further rights.  *A putative spouse acquires the rights conferred upon a legal spouse*, including the right to maintenance following termination of his status . . . . [Emphasis added.]

We have held that "[t]he *rights of putative spouses are protected* in Section 40-1-404, MCA, where any person has cohabited with another to whom he is not legally married in the good faith belief that he was married." *Murnion*, 212 Mont. at 118, 686 P.2d at 899 (emphasis

67

added). This provision specifically grants all rights of a legal spouse to a person who cohabited with another in the good faith belief they were married. Thus, it is not the common-law marriage doctrine which primarily protects a person following the end of the relationship. Indeed, a person is protected by this statute even if his or her claim of common-law marriage *fails*.

¶141 Finally, the Court asserts that should the couples who have signed the Affidavit wish to assure their marital status, there is "no need to resort to the 'common law' since Montana statutory law provides for a written declaration of marriage without solemnization and they may avail themselves of this informal statutory process as provided by the Legislature in § 40-1-311, MCA." ¶ 34. The Court's premise is that there can be no common-law marriage here because there is no common law where the law is declared by statute, and thus, common-law marriage has been abrogated under these circumstances by operation of the statutes which provide for a written declaration of marriage. The Court errs here in two ways.

¶142 First, § 40-1-403, MCA, declares that "common-law marriages are not invalidated by this chapter." In other words, the Legislature has specifically provided that nothing in the marriage statutes governing solemnization or declaration has done anything to affect the validity of common-law marriages. Thus, the marriage statutes which provide for other ways of marrying have not invalidated the law of common-law marriage for any circumstances, including those here. The Court can cite to no authority for its assertion to the contrary.

¶143 Likewise, the Court errs by concluding that "there is no need to resort to the 'common law'" because the couples could have used a written declaration of marriage without

68

solemnization to establish their marriage. I do not disagree that marriage by declaration may also have worked and may even have been preferable.[14] However, the failure to use a statutory marriage option, even one that may have been better under the circumstances, does not invalidate all other avenues which the law provides for marriage.

¶144 A summary of the Court's various holdings here reveals the dramatic nature of the changes it has made to the substantive law of common-law marriage, beyond its procedural actions of entertaining new arguments on appeal. First, the Court has imposed, without citation to any case, the new requirement of "extrinsic evidence," *see* ¶¶ 24, 33, and holds that an affidavit is insufficient, though both of these principles are inconsistent with our law providing that proof need not "be expressed in any particular form." *Hunsaker*, ¶ 34. The Court overrules the law governing the marriage presumption, which, prior to this decision, "was itself sufficient to establish the marriage unless overcome by other evidence." *Spradlin*, 262 F.Supp. at 505. Although that presumption formerly held a position as "the strongest known to the law," *Murnion*, 212 Mont. at 113, 686 P.2d at 897, the Court's decision reduces it to nothing. The Court then prohibits, without citation to authority, claims to common-law marriage claims which it defines as "prospective." *See* ¶¶ 24, 33. Although the evidence in this case demonstrates past and present actions of the couples, and therefore, the "prospective" rule is inapplicable here, this is, nonetheless, a limitation in the law of common-law marriage never before recognized. Then, in a dramatic holding, the Court prohibits

---

[14]I fail to see, however, how couples signing a declaration of marriage would be any less "shocked" to discover they were married than couples who signed a declaration of common-law marriage, *see* ¶ 33, but I will stick to the actual record in this case.

common-law marriages in those situations in which the couples could have been married using a statutorily authorized method of marriage. *See* ¶ 34. Pursuant thereto, the Court directs federal, state and private agencies to use only the provisions of § 40-1-311, MCA, when seeking to recognize marriages, prohibiting them from considering marriage under the common law. *See* ¶ 36. This is accomplished without citation to a single Montana case which would support any of these holdings.

¶145 Despite all of this, the Court proclaims that its opinion simply "reaffirms existing common law marriage jurisprudence." *See* ¶ 35. Reaching the dewpoint of duplicity, the Court then offers that "[w]e haven't changed anything." *See* ¶ 35. To the contrary, and as illustrated by the preceding paragraph, the Court has changed just about everything in regard to the law of common-law marriage and its application.

¶146 I submit, respectfully, that every piece of the rationale offered by the Court in support of its holding is inconsistent with the law. There is no basis to invalidate the University's policy of granting marital benefits for those couples who are common-law married. The policy is fully justified under the law, both by proof and by process. Having so concluded, I turn to the issues actually pled by the Appellants in the District Court.

¶147 Appellants claim that the University's policy of conditioning benefits upon marriage violates equal protection by impermissibly discriminating on the basis of sex, sexual orientation, and marital status, and further, that the policy's reliance upon marriage violates their fundamental rights under the Montana Constitution, particularly, the right to dignity. Here, an important distinction must be made.

70

¶148 The Court states that this case is "not about" a challenge to Montana's marriage laws, noting that Appellants have not asked us to address the question of whether Montana's marriage statutes discriminate against same-sex couples. *See* ¶ 13. This is true in the technical sense, but, without more, gives an incomplete picture about this case. The Court is correct that Appellants are *not* asking in this case for the right to marry. However, they *are* challenging the policy of granting partner benefits on the basis of marriage. In other words, Appellants, as unmarried same-sex couples, claim entitlement to the same benefits that are granted to married couples, arguing that the University's policy of relying on marriage is impermissible discrimination. Thus, Appellants are challenging the right of government (and by extension, any entity) to define eligibility for benefits by reliance on the law's recognition of legal marriage. If they prevail, defining eligibility for benefits for partners on the basis of marriage would no longer be permissible vis-a-vis unmarried couples. In this context, marriage would be rendered simply a societal option without exclusive legal significance. More accurately then, this case "is about" the legal status of marriage in our society, specifically, whether the law still recognizes marriage as the transcendent societal relationship upon which government may base its decisions.

¶149 Similarly, in my view, the concurrence mis-frames the issue before the Court. It states that "this is not a gay marriage case. This case is about providing equal financial benefits to similarly situated employees of the same employer." *See* ¶ 105. I agree that this case is not about gay marriage. Rather, it is about legal, heterosexual marriage and its status under the law. The equal protection premise considered by the concurrence is that "heterosexual

couples are entitled to more and better employment benefits than are homosexual couples," from which it concludes that this unequal treatment violates constitutional principle. *See* ¶ 87. That the concurrence has incorrectly analyzed this case as merely one about the treatment of heterosexual couples versus homosexual couples is apparent, not only from a review of the pled facts and the issues raised, but also from the logical outcome of its reasoning: unmarried *heterosexual* couples would be also entitled to partner benefits. In other words, the concurrence would require that all couples be equally treated, without regard to sex or marital status. Therefore, at its core, the concurrence's analysis is flawed because it fails to consider that the heterosexual couples here are *married*, whether by solemnization, declaration, or common law, and then fails to consider whether the University's reliance upon marriage is lawful in light of the Appellants' challenges.[15] Thus, neither the Court nor the concurrence has addressed the essential issue raised by the challenge: the legal status and effect of marriage.

¶150 Marriage between a man and a woman is based upon thousands of years of cultural experience. Its legal status is founded upon hundreds of years of legal precedent. We have stated that "[u]pon [marriage] depends the home, upon the preservation of which, in turn, depends good citizenship and the permanency of a republican form of government. The state

---

[15]The concurrence offers, in three paragraphs, reasons why the "preserving-the-institution-of-marriage argument fails." *See* ¶ 105. The reasons offered include that (1) this is not a gay marriage case, discussed above, (2) economic and social reasons that marriage will not be harmed by giving benefits to homosexual couples, and (3) why countering social opinions should not control the outcome here. The concurrence does not, however, offer a legal analysis of the status of marriage, and whether government may lawfully continue to base decisions thereon.

therefore favors the institution of marriage." *Franklin v. Franklin* (1910), 40 Mont. 348, 350, 106 P. 353, 354. The United States Supreme Court has held:

> It is also to be observed that, whilst marriage is often termed by text writers and in decisions of courts a civil contract–generally to indicate that it must be founded upon the agreement of the parties, and does not require any religious ceremony for its solemnization–it is something more  than a mere contract. . . . It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress.

*Maynard v. Hill* (1888), 125 U.S. 190, 210-11, 8 S.Ct. 723, 729, 31 L.Ed. 654, 659.

¶151 Given the status of marriage, it is hardly surprising that, as Respondent notes, courts on a national scale have routinely rejected constitutional challenges to state law limiting marriage to opposite-sex couples and have denied claims of same-sex couples to the benefits available to married couples. These cases recognize generally that the claims to unequal treatment cannot prevail against the simple, yet profound principle that marriage between a man and woman is fundamental to our society, that the state has a legitimate interest in promoting marriage, and that this relationship cannot be approximated, copied or equaled by any other without the collective will and action of the people. As stated by the Wisconsin Court of Appeals:

> [W]hether to allow extension of state employee health insurance benefits to companions of unmarried state employees of whatever gender or sexual orientation–is a legislative decision, not one for the courts. Indeed, the point is well made in the brief of the American Civil Liberties Union Foundation and the American Civil Liberties Union of Wisconsin Foundation, as *amici curiae*, when, urging us to rule that state insurance coverage be extended to employees' companions, they suggest that we can ensure responsible administration of such a program by "creat[ing] a scheme" to ensure that benefits are extended only to same-sex couples with adequate "indicia of commitment" to each other–or

73

a "registration scheme" that "is enforceable and guards against fraud."

> "Creation" of verification and registration systems designed to facilitate the extension of state employee benefits to the employees' unmarried companions–and an enforcement mechanism to ensure that only stable and committed same-sex couples are eligible for such benefits–is precisely the type of action committed to the legislature, as the policymaking branch of government. *It is beyond all powers of this or any other court.*

*Phillips v. Wisconsin Pers. Com'n* (Wis. Ct. App. 1992), 482 N.W.2d 121, 124 n.1 (emphasis added).

¶152 Appellants contend that the University's policy discriminates on the basis of marital status because it cannot be demonstrated that the policy "was rationally selected to advance an independent, legitimate governmental purpose." However, the legitimate purpose is to provide benefits to the partners of University employees. As demonstrated by the above quote from *Phillips*, the use of marriage to define partner eligibility creates certainty and practicality in administration of a large benefit program because it incorporates existing state law regarding family relationships. As a matter of law, married couples are engaged in a permanent relationship because the relationship cannot be terminated except by operation of law. Thus, there is a legally presumptive stability that attends to the marital relationship that does not exist in other relationships, an important consideration in the administration of health plans. Further, the policy is "rationally related to a legitimate state purpose, the state's interest in promoting marriage." *Hinman v. Dep't of Pers. Admin.* (Cal. Ct. App. 1985), 167 Cal.App.3d 516, 523 (denying claim for dental benefits for same sex partners of state employees).

74

¶153 Appellants contend that the University's reliance on marriage is sex-based discrimination because the policy "den[ies] dependent benefits to a female employee with a female partner while offering them to a male employee with a female partner." However, the policy itself rests upon state law which limits marriage to male-female couples, and which, with the passage of CI-96 on November 2, 2004, immediately effective, is constitutionally established. The law is not sex-based, but facially neutral, because it prohibits both men and women from marrying a person of the same sex. To the extent it could still be argued that the law is sex-based because it prohibits marriage based upon one's sex, that classification is, nonetheless, now constitutionally sanctioned.

¶154 Appellants further contend that the University's policy discriminates on the basis of sexual orientation. There is a dearth of authority that sexual orientation is a suspect class for equal protection purposes, but further, and again, the policy is based upon state law defining marriage as between a man and a woman. The marital relationship between a man and a woman is now a constitutionally-protected classification. The University's policy is consistent with that constitutional classification and therefore, the government's reliance on that classification cannot result in unlawful discrimination. While these claims may neither have prevailed prior to the passage of CI-96 either, those arguments are now moot and need not be addressed.

¶155 Lastly, the Appellants claim the University's policy violates their fundamental constitutional rights, particularly, the right to dignity. The concurrence accepts the

75

Appellants' argument, and concludes that the University's policy should be invalidated by application of the dignity provision. *See* ¶ 97. I thus turn to this final claim.

¶156 I would note at this juncture that I respect the personal concern that drives the concurrence. I would not question the author's sincerity nor his desire to render decisions he believes will improve the lives of people. Thus, my disagreement with the concurrence is not with its empathy, but with its legal analysis.

¶157 The concurrence would hold that "[h]uman dignity may not be violated–no exceptions." *See* ¶ 77. It suggests that various principles emanate from the Constitution's dignity provision that this Court should encase as law. While admirable in thought, such an expansive reading and rendering of the dignity provision would easily subsume concrete constitutional principles. There is nothing within constitutional jurisprudence, for example, of equal protection, due process or cruel and unusual punishment, that would not be superseded by the mandate that all people be treated with "dignity." Indeed, the offered model purports "to declare one way in which human dignity can be violated–by denying someone the equal protection of the law based on some sort of arbitrary classification . . . ." *See* ¶ 72. Thus, instead of a constitution embodying numerous principles interpreted and understood in accordance with their respective jurisprudence, ultimately we would have a constitution embodying a single, overriding and encompassing principle–dignity.

¶158 Of course, dignity undergirds the Constitution and is part of the philosophical foundation of our Constitution. We would desire that all would be treated with dignity and work toward such end under the law, but that is something far different than interpreting the

law to require all outcomes be consistent with dignity–whatever that would mean, and that is the problem. Elevating the dignity provision to such a place would inevitably require that a judges' subjective feelings about how a person should be treated be enshrined as law, and that without limits, because "human dignity may not be violated–no exceptions." The concurrence itself is illustrative of this concern.

¶159 The concurrence reaches its implied conclusion–that marriage can no longer be used as a basis for governmental decision and action–without any evidence. This is an appeal from the granting of a motion to dismiss, and there are no facts of record beyond those asserted in the pleadings. Instead, the concurrence is fueled by sociological research. While research is important and is occasionally referenced in court opinions, it is notable here that none of the sociological information relied upon by the concurrence was introduced as part of the District Court record, and thus, no opportunity to rebut or defend those assertions was ever given to the Respondents. Evidence is not critical in order for judges to decide cases on the basis of their personal concept of dignity.

¶160 The concurrence's analysis of the dignity provision is comprehensive. The Constitution's language and history is finely combed. However, not a single word can be found therein which would give even a clue that the dignity provision was intended by the constitutional convention delegates, or could be extrapolated, to re-order the exclusive nature of marriage or otherwise expand marital or related rights to those who did not have them at the time the Constitution was adopted. The concurrence asserts such rights are included with those "retained by the people." However, the rights which the concurrence would grant had

not been granted anywhere in the country at the time of the Constitution's adoption. Discussion about such a fundamental altering of society cannot be found or implied in our constitutional history. Would anyone deny, that had Montanans been advised that the word "dignity" in our Constitution could be interpreted by judges as legitimizing or benefitting homosexual relationships, the Constitution would never have been approved in 1972? Would anyone disagree with the same proposition concerning an election today? No one would, because it cannot be denied. Thus, the very document which sets forth the word "dignity" would not exist under philosophical assumptions offered by the concurrence.

¶161 This underscores the authority that judges would need to take to themselves in order to do what the concurrence suggests. It would require judges to read into the Constitution, either in a manner never contemplated by the people, or, as illustrated by the passage of CI-96, directly opposed by the people. To undertake such power would require judges to deny the rights of the people which are more fundamental than the right to dignity: the right of the people to define their society and to govern themselves. Although the concurrence calls up Madison's "tyranny of the majority," rendering the conclusion it advocates would require judges to act as a "tyranny of the few," depriving the people of their sovereign rights:

> What goes on in other people's bedrooms is a question that has intrigued me since reaching puberty, but it is none of my business. I thus find it distasteful to uphold the denial of health insurance to the dependents of a deserving segment of the workforce merely because of their sexual predilections.
>
> . . . .

78

> . . . [However, w]e must take care not to read the constitution to embrace subjects never thought to be within its reach. The more the state constitution is found to be intolerant of disagreement, the deadlier becomes the grip upon the people's inventiveness.
>
> The most cherished principle in our system is that government rests on the consent of the governed. The central idea is that in the meandering course of history, there is time for vision and revisions–for mistakes to be made by the people and rectified by the people. Democracy has its price. . . . But, surely, the judiciary does not have a monopoly on justice. Appellants must seek redress in another forum.

*Rutgers Council of AAUP v. Rutgers State Univ.* (N.J. Super. 1997), 689 A.2d 828, 838-39

(J.A.D. Baime, concurring).

¶162   The concurrence taunts the will of the people with repeated criticisms of majoritarian morality. It is this very "majoritarian morality" that has placed into law those principles upon which society rests. By law, "we the people" feed the hungry, care for the sick, build schools and hospitals, educate the population, protect workers' safety and wages, define and prosecute crime, punish the criminal without cruelty, defend the country, rescue the abused child, and recompense for damages inflicted, to name a few. Without majoritarian morality, we would not be having this discussion today, because a civil society would not exist. For that reason it is incorrect to define this issue as a violation of liberty. Liberty is not a license to do what is right in one's own eyes. That is anarchy. Liberty in a free society is the right to pursue one's own life within the solemn principles that "we the people" have established for governance of the society. As the delegates stated, referenced within the concurrence's quote in ¶ 54, "the guidelines and protections for the exercise of liberty in a free society come not from government but from the people who create the government."

79

¶163 The Montana Constitution's opening phrase of "We the people" mirrors the words of the United States Constitution. "The United States was then the only country in the world with a government founded explicitly on the consent of its people, given in a distinct and identifiable act, and the people who gave that consent were intensely, profoundly conscious of the fact." Larry D. Kramer, *The People Themselves* (2004), p. 5, Oxford University Press. The phrase means many things obvious, but more than the obvious is revealed when the history of the phrase is studied carefully. Included therein are deep feelings about the nature of the Constitution, and the people's role in its application:

> It means refusing to be deflected by arguments that constitutional law is too complex or difficult for ordinary citizens. Constitutional law is indeed complex, for legitimating judicial authority has offered an excuse to emphasize technical requirements of precedent and legal argument that necessarily complicated matters. But this complexity was created by the [United States Supreme] Court for the Court and is itself a product of judicializing constitutional law. In reclaiming the Constitution, we reclaim the Constitution's legacy as, in Franklin D. Roosevelt's words, "a layman's instrument of government" and not "a lawyer's contract." Above all, it means insisting that the Supreme Court is our servant and not our master: a servant whose seriousness and knowledge deserves much deference, but who is ultimately supposed to yield to our judgments about what the Constitution means and not the reverse. The Supreme Court is not the highest authority in the land on constitutional law. We are.

Kramer, *The People Themselves*, p. 248.

¶164 "We the people" in the Preamble to the Montana Constitution means that the Constitution is the people's–its creation, its adoption, its interpretation–and further means that it is the people who determine how their state shall be governed. It does not mean "We the judges."

80

¶165  I would affirm the District Court.


/S/ JIM RICE


Justice John Warner joins in the foregoing dissent of Justice Rice.


/S/ JOHN WARNER

Chief Justice Karla M. Gray, dissenting.

¶166  I respectfully dissent from the Court's opinion.   I agree with part--but not all--of Justice Rice's dissent, and feel compelled to comment on several matters.

¶167  Most basically and most importantly, it is critical to remember that this case is before us on appeal from a decision entered by the First Judicial District Court, Lewis and Clark County.   It is not an original proceeding in this Court.  The issue, therefore, is not as stated by the Court.  The issue is whether the District Court erred in granting the University System's motion to dismiss.  Other than several passing references to the District Court's granting of that motion and a statement that the District Court erred--on the basis of an issue not presented to it--in the first step of its equal protection analysis, even a brief reading of the Court's opinion clarifies that it has totally ignored the District Court's legal analysis of the issues presented to it by the parties.  One can only speculate about why the Court has chosen to do so.

¶168  The fact remains that the Court resolves the present case, and reverses the trial court, on the basis of an issue not presented to the trial court.  Our cases holding that we do not consider new issues--or changed theories--on appeal are so legion as to require no citation to authority.  The reason is mentioned above:  as a *reviewing* Court, it is fundamentally unfair for us to reverse a district court on the basis of arguments not presented to it.   In addition, of course, doing so essentially makes this Court the court of first--rather than last-- resort in an appeal.  The Court's statement that we may address the issue because the parties briefed it totally misses the essence of *our* "will not consider" rule, which focuses not on

82

what the parties argue, but on this Court's proper role as a reviewing court. Absent a reasoned and correct legal analysis by this Court establishing some error of law in the District Court's resolution of the case before it, I would affirm that court. Because the Court addresses the new issue, however, I feel compelled to respond.

¶169 I disagree strongly with the Court's discussion and analysis of common law marriage, which is the basis on which it determines that this is a case about unmarried opposite-sex couples versus unmarried same-sex couples, rather than about married couples versus non-married couples. Indeed, the inherent flaw--both logically and legally--in both appellants' arguments and the Court's opinion can be seen early on when the Court relates that the appellant couples "consider themselves married and hold themselves out to their families and their community as a couple in a committed, marital relationship." There is no question that these couples consider themselves married in their hearts and souls; nor do I doubt for a moment that they hold themselves out as such and, hopefully, are accepted as such in the hearts of their communities. The problem is that Montana does not recognize same-sex marriages. Under the law--whether we like it or not--these couples are not eligible for marriage in the state of Montana whether by solemnization, declaration or common law. I cannot join in the Court's creation of the artificial construct of "unmarried opposite-sex and unmarried same-sex couples" for purposes of resolving this appeal.

¶170 I do join the Court in acknowledging the extraordinary number of *amici curiae* who appeared in this case. Our legal analyses are often illuminated by such *amici*, which is as it should be. Indeed, the facts set forth by the Court from *amicus* Northwest Women's Law

Center regarding the numerous entities which have allowed same-sex domestic partners to qualify for benefits are interesting and, perhaps, indicative of a trend. These facts, however, are of no relevance to the legal issues before us. That many may *choose* to provide such benefits to same-sex domestic partners bears no relationship to the legal question of whether the law requires such an action. Indeed, I wonder whether all of the *amici* siding with the appellants in the present case have chosen to provide health benefits to same-sex domestic partners. The fact remains, contrary to the Court's "restatement" of the University System's policy, that by its terms the policy permits all University System employees who have spouses recognized by Montana law--whether via solemnization, declaration or common law--to purchase health benefits for their marital partners. Thus, I turn briefly to the Court's discussion of the University System's Affidavit.

¶171 The University System's Affidavit of Common-Law Marriage is a sworn statement by couples eligible for marriage under Montana law. When sworn and subscribed to, and duly notarized, it is a clear statement that the couple has--since a past date--lived together as husband and wife and taken on the responsibilities and duties of marriage. The Court apparently believes University System employees will swear to untruths. I cannot join the Court in such an unsupported perception of University System employees.

¶172 The Court also cites to a law review article on the subject of the continued viability of common law marriage (a proposition unrelated to the present case) which observes that no jurisdiction permits a statement of future intent to create a common law marriage. While the observation is undoubtedly true, the Affidavit at issue here is *not* a statement of future

84

intent, as discussed above. The Court goes on to interpret the Affidavit as being one by a couple "who declines to sign a statutory written declaration." Such a negative connotation is totally unwarranted in a state which recognizes common law marriage. The fact is that the sworn Affidavit used by the University System evidences that the couple has married under the common law. Most assuredly, the Affidavit does not create the marriage. In my view, however, the Affidavit is not reasonably susceptible to a determination by this Court that the sworn statements are made by those who "may not choose to marry at all, but rather may choose to sign a document in order to receive employment benefits." Not surprisingly, nothing of record supports such a determination.

¶173   Nor does the Court's statement that we are "not aware of any Montana 'case' in which a common law marriage has been established without one of the parties involved in the relationship using extrinsic evidence to prove" the existence of the elements of a common law marriage advance its theory in any substantive way. That this Court sees very few cases involving common law marriage does not mean there are not thousands of such marriages in Montana which never require a court determination regarding the marriage at all, even on the death of one of the spouses. Moreover, I daresay that district courts across the state have conducted any number of dissolution proceedings involving spouses in a common law marriage where the validity of the marriage never arises and need not be determined. I personally know of a situation in which a common law marriage was dissolved in the usual way under the laws applicable to the dissolution of  marriages, without any issue being raised--or resolved by the trial court--about the existence of the common law marriage. It

85

is disingenuous for this Court to rely on a mere lack of "awareness" of any common law marriage "case" not involving extrinsic evidence while ignoring the certainty that the issue of the existence of a common law marriage thankfully does not always result in litigation at all, much less litigation which makes its way to this Court.

¶174 For equal protection purposes, and notwithstanding the Court's statement to the contrary, there is nothing "illusory" about the marital versus non-marital nature of the University System's policy. Indeed, the appellants argued in the District Court, and argue here, a marital versus non-marital classification. The classes created by the policy are based entirely on the kinds of marriages recognized by Montana law, not sexual orientation. For purposes of this case, the difference between the "classes" is that one class involves a spouse in a legally recognized marital relationship and the other class involves a committed partner in a relationship which under current Montana law does not--and cannot--constitute a marriage in any legal sense. Thus, the present case is readily distinguishable from both the Court's and former Chief Justice Turnage's opinions in *Gryczan*, which did not involve a marital classification. Moreover, expressly unlike the present case, *Gryczan* presented a challenge to the constitutionality of a statute criminalizing sexual acts between same-sex people. Here, we all agree the appellants are not directly challenging Montana's laws relating to the definition of marriage. For those reasons, I submit *Gryczan* has no application here.

¶175 With regard to the Court's statement that it is unconvinced the policy at issue is justified based on administrative efficiency, surely the Court cannot mean administrative

86

efficiency is not a legitimate governmental interest. Perhaps the Court merely means that it disagrees the policy advances administrative efficiency. If so, I suggest that this Court is not in a position to make such a determination for the University System; nor could we properly conclude that a marital versus non-marital classification is not a rational means of making health benefits available to "dependents" of University System employees. "Rational" does not equate to what this Court might have chosen to do.

¶176   In any event, it is true--as the Court states--that the University System *could* adopt other policies. Those policies conceivably could make health benefits available to any and all individuals chosen by University System employees. They conceivably could exclude health benefits for any spouses or children of University System employees. But the issue here is whether the policy actually adopted by the University System denies equal protection of the law. In my view, it does not, at least as discussed and resolved by the Court.

¶177   It is difficult to close without addressing, in some way, Justice Nelson's passionate and scholarly concurring opinion which correctly notes the historic discrimination against gay and lesbian citizens, cites to much sociological and academic literature and other materials, and provides a number of analytical approaches based on various articles and books. We all have passions that run deep and strong, and the nice thing about either authoring or responding to a concurring opinion is that one is more free to express her/himself outside the strictures that generally apply to a Court opinion. For myself, however, the closer I stay to the law and away from personal passions, the better I perform this very difficult job. Moreover, concurring opinions and responses thereto sometimes are

87

viewed by others--whether intended by the author or not--as taking positions in advance on matters that need not be addressed in the context of the present case. Again, for myself, I would rather await a case or controversy presenting a clear issue, based on a record, which necessarily requires resolution of an issue.

¶178 In sum, I dissent from the Court's opinion and, since no error is established by the Court in the District Court's resolution of the issues before it, I would affirm the District Court.


/S/ KARLA M. GRAY